[Cite as *Sigler v. Burk*, 2017-Ohio-5486.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY


STEPHEN SIGLER,

    PLAINTIFF-APPELLANT,               CASE NO.  3-16-19

    v.

ROBERT BURK, ET AL.,               O P I N I O N

    DEFENDANTS-APPELLEES.


Appeal from Crawford County Common Pleas Court
Probate Division
Trial Court No. 031784 E

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   June 26, 2017


APPEARANCES:

    *Jason H. Beehler* for Appellant

    *Eric H. Griebling* for Appellee

**ZIMMERMAN, J.**

{¶1} This appeal is brought by Stephen Sigler, Appellant, from the judgment of the Probate Court of Crawford County granting summary judgment in favor of Janet and Robert Burk, Appellees, in a will contest action. For the reasons that follow, we affirm the decision of the trial court in part and reverse the decision in part, and remand this matter to the trial court for further proceedings consistent with this opinion.

{¶2} Prior to her death on July 20, 2014, the decedent, Martha Sigler ("Martha"), executed her Last Will and Testament on July 3, 2014. Martha's Will was admitted to probate on August 4, 2014 in Crawford County, Ohio. On August 20, 2014, Martha's son and sole surviving heir, Stephen Sigler ("Stephen"), an Alabama resident, filed a motion to dismiss the probate proceedings in Crawford County for lack of jurisdiction, claiming that Alabama, not Ohio, was Martha's domicile. The trial court overruled Stephen's motion. Thereafter, Stephen filed a will contest complaint ("Complaint") in the trial court on November 26, 2014, naming Martha's brother, Robert Burk ("Robert") and his wife, Janet Burk ("Janet") as defendants.

{¶3} The Complaint sets forth four counts against Robert and Janet, specifically: Count I – Testamentary Capacity; Count II - Undue Influence; Count III – Concealment of Assets; and Count IV - Intentional Interference with

Expectancy of Inheritance. Robert and Janet filed their answer on December 11, 2014, which they amended on March 3, 2016, alleging that the counts involving concealment and intentional interference with expectancy of inheritance were frivolous. The Burks further demanded a jury trial.

{¶4} Upon completion of discovery, Robert and Janet filed for summary judgment in the trial court on March 17, 2016. Stephen filed his response in opposition to summary judgment on April 8, 2016. The trial court issued a lengthy judgment entry granting summary judgment on August 2, 2016 and dismissed Stephen's complaint. Stephen appeals this decision and presents the following two assignments of error for our review:

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE BURKS BECAUSE MATERIAL ISSUES OF FACT EXIST.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT IMPROPERLY WEIGHED THE EVIDENCE AND CREDIBILITY OF WITNESSES WHEN RULING ON THE MOTION FOR SUMMARY JUDGMENT.**

{¶5} On appeal, Stephen challenges the trial court's decision granting summary judgment, stating that genuine issues of material fact exist as to whether Martha had the testamentary capacity to execute her Will and as to whether Robert and Janet unduly influenced her in making a Will. Specifically, Stephen argues that:

(1) the trial court failed to examine evidence and testimony demonstrating that issues of fact exist; (2) the trial court improperly usurped the jury's role as fact-finder; and (3) the trial court "inconsistently" addressed relevant facts from a reasonable time before and after Martha executed her Will. For the purpose of judicial economy and because the assignments of error are interrelated, we will address them together, starting with the issue of Martha's testamentary capacity.

*Standard of Review*

{¶6} An appellate court reviews a trial court's decision on a motion for summary judgment *de novo*. *Hancock Fed. Credit Union v. Coppus,* 2015-Ohio-5312, 54 N.E.3d 806, ¶ 15 (3rd Dist.). Trial courts may grant a motion for summary judgment when "(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Hamilton v. Hector,* 117 Ohio App.3d 816, 819, 691 N.E.2d 745 (3rd Dist.1997). Additionally, "'upon appeal from summary judgment, the reviewing court should look at the record in the light most favorable to the party opposing the motion.'" *Id.* quoting *Campbell v. Hosp. Motor Inns, Inc.,* 24 Ohio St.3d 54, 58, 493 N.E.2d 239 (1986).

*Testamentary Capacity*

**{¶7}** An order admitting a will to probate is *prima facie* evidence of its validity pursuant to R.C. 2107.74; however, an otherwise valid will may be invalidated if the testator lacked testamentary capacity at the time the will was executed. *Niemes v. Niemes,* 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the syllabus. Evidence of the testator's mental and physical condition, both at the time the will is executed and within a reasonable time before and after its execution, is admissible as casting light on testamentary capacity. *Kennedy v. Walcutt,* 118 Ohio St. 442, 161 N.E. 336 (1928), paragraph two of the syllabus, *overruled on other grounds, Krischbaum v. Dillon,* 58 Ohio St.3d 58, 567 N.E.2d 1291 (1991). The burden of proof in determining testamentary capacity is upon the party contesting the will. *Id.* at paragraph six of the syllabus.

**{¶8}** Testamentary capacity exists when the testator has sufficient mind and memory; first, to understand the nature of the business in which the testator is engaged; second, to comprehend generally the nature and extent of the testator's property; third, to hold in the testator's mind the names and identities of those who have natural claims upon his (her) bounty; and fourth, to appreciate the testator's relation to members of his family. *Niemes, supra.*

*Relevant Facts*

{¶9} As of May 1, 2014, the decedent, Martha Sigler, a 79-year-old widow, resided alone in Montgomery, Alabama. When necessary, Martha was cared for by her only living child, her adult son Stephen (Appellant) who also lived in Alabama. On May 1, 2014, Martha fell and broke her pelvis, which resulted in her being hospitalized in Jackson Hospital in Alabama. From May 1st until her death on July 20, 2014, Martha was in and out of rehabilitation facilities and hospitals and never returned to her home to live.

{¶10} During her hospital stay in Alabama, Martha was not happy with Stephen's attention to her and to the care she was receiving, so she contacted her older brother, Robert Burk, who lived in Galion, Ohio for assistance. At Martha's urgence, Robert and his wife Janet, arranged for Martha to be transferred from Jackson Hospital in Alabama to the Mill Creek Nursing and Rehabilitation Center in Galion, Ohio. Martha began her stay at Mill Creek on June 11, 2014 and was treated there by a number of medical professionals for issues related to her fall as well other medical issues.

{¶11} The medical care professionals who assisted Martha at Mill Creek included: Dr. Marc G. Schramm, a clinical psychologist; Julie Kight, a licensed speech therapist; Kimberly Collins, RN; Jenny Koge, RN and former Director of

Nursing at Mill Creek; Dr. Gohar Ghazarian, hospitalist; Peggy Skidmore, RN; and Dr. Mark Wood.

{¶12} While at Mill Creek Martha relied upon Robert and Janet for her personal needs and for financial advice. They also introduced Martha to attorney Jay Wagner ("Wagner") who prepared a number of legal documents for Martha including: her Last Will and Testament; a Living Will; a Power of Attorney naming Robert Burk as her attorney-in-fact; and a Power of Attorney naming Janet Burk as her alternate attorney-in-fact. Wagner met with Martha at Mill Creek twice concerning these legal documents.

{¶13} On July 3, 2014, Martha signed her Will at Mill Creek. Louise Brutchey, Wagner's legal secretary and Ralph Mills witnessed the Will. Martha's Will provided that Robert and Janet would receive 80% of her estate and Stephen the other 20%. Martha died July 20, 2014, seventeen (17) days after she signed her Will.

*Summary Judgment as to Testamentary Capacity*

{¶14} In our determination as to whether a genuine issue of material fact remains to be litigated as to Martha's testamentary capacity, we must review the record in the light most favorable to Stephen, the non-moving party to summary judgment. However, we commence our *de novo* review starting with the pleadings, evidence, and affidavits presented to the trial court by Robert and Janet, since they

have the burden of proof to show the *absence* of a genuine issue of material fact concerning Martha's testamentary capacity to make a Will.

{¶15} As explained in *Dresher v. Burt:*

[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56(C) simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Parks v. Parks,* 3rd Dist. Allen No. 1-99-11, 1999-Ohio-843 *2, quoting *Dresher v. Burt,* 75 Ohio St.3d 280, 292-93,1996-Ohio-107, 662 N.E.2d 264.

{¶16} Robert and Janet's motion for summary judgment (Doc. No. 24) was filed in the trial court on March 17, 2016, and was accompanied by:

- Deposition of Stuart Bear with exhibits 1-2; 4-9 (Doc. No. 10, 12/16/14 Dep.).

- Deposition of Lisa Olszewski (Doc. No. 10, 12/22/14 Dep.).

- Deposition of Jacqueline Compton with exhibits 1-3 (Doc. No. 10, 12/16/14 Dep.).

- Affidavit of Louise Brutchey with exhibits A - E (Doc. No. 26).

- Affidavit of Jay D. Wagner with exhibits A - F (Doc. No. 27).

- Affidavit of Ralph A. Mills with exhibit A (Doc. No. 28).

- Affidavit of Robert L. Burk with exhibits A - B-4 (Doc. No. 29).

- Affidavit of Janet E. Burk with exhibits A - N (Doc. No. 30).

- Affidavit of Mary Jane Fuller (Doc. No. 31).

- Affidavit of Marc G. Schramm with exhibits 1- 6 (Doc. No. 32)

*Transaction of Business*

{¶17} Martha's capacity to understand the business in which she engaged is the first element of testamentary capacity for our review. As noted in *Niemes,* "[T]he transaction of the ordinary affairs of life involves a contest of judgment, wisdom, and experience, and often demands an exercise of mentality superior to that required in the testamentary disposition of property." *Niemes* at 505.

{¶18} Jacqueline Campton ("Campton"), a nurse at Jackson Hospital in Alabama, testified by deposition. Campton testified that she provided Martha's treatment during her time at Jackson Hospital in May and June, 2014. Campton testified that it was Martha's decision to move to Ohio and that her brother, Robert, had found a facility in Ohio for her to live. (12/16/14 Jacqueline Campton Dep. at

37-38). Additionally, Martha wanted to move to Ohio to be "with her family." (*Id.* at 49).

{¶19} In the deposition of Stuart Bear ("Bear"), an Alabama business acquaintance of Martha's, Bear testified that Martha contacted him in June, 2014, while she was in Jackson Hospital, to hire him to unlock her home for Robert (Martha's brother). Bear testified that Martha hired him to change the locks on her home earlier in the year. (12/16/14 Stuart Bear Dep. at 17). Martha wanted Bear to unlock her home so Robert could pick up some of her personal effects and clothing to take with her to Ohio. (*Id.* at 19).

{¶20} Martha's Alabama neighbor, Lisa Olszewski ("Olszewski") also testified by deposition. (12/22/14 Lisa Olszewski Dep.). Olszewski testified that she visited Martha at Jackson Hospital just prior to Martha's discharge on June 10, 2014. Olszewski testified that Martha was fearful of remaining in Jackson Hospital too long, because of its impact upon the number of "Medicare days" she was permitted. (*Id.* at 22, 28). Olszewski also testified that Martha was upset with Stephen as her power of attorney, and that she feared that he would "blow her money." Martha wanted to find a way for Stephen to receive her money in a manner that would last him "for the rest of his life." (*Id.* at 44).

{¶21} The affidavits of Robert and Janet Burk also provide evidence of Martha's business decision making. Robert's affidavit details Martha's requests (of

Robert) to "come and get [her]" when she was in Jackson Hospital. (Doc. No. 29 at ¶ 6). The affidavit also details Martha's decision to appoint him (Robert) as her power of attorney, to authorize him to sell her Alabama home, to liquidate some of her bank accounts, and to move her (Martha's) personal property from Alabama to Ohio. (*Id.* at ¶¶ 7-8).

{¶22} Janet's affidavit states that Martha called her (Martha's) credit card bank to alert them that a $6,000 charge for ambulance services (to transport her from Alabama to Ohio) would appear on her account. (Doc. No. 30 at ¶ 16). Janet's affidavit confirms Bear's testimony that Martha arranged for him to unlock her home so Robert could pick up Martha's clothing, her wheelchair, and her personal papers to take to Ohio. (*Id.* at ¶ 17). Lastly, Janet's affidavit chronicles Martha's steps to revoke Stephen's power of attorney by appointing Robert as her successor power of attorney. (*Id.* at ¶ 19).

{¶23} In our *de novo* review of this first element of testamentary capacity (under *Niemes*) competent and credible evidence exists in the record demonstrating the absence of a genuine issue of material fact that Martha had sufficient mind and memory to understand the nature of the business in which she engaged at or near the time she signed her Will.

*Martha's Ability to Comprehend the Nature
and Extent of her Property*

**{¶24}** The second element of testamentary capacity under *Niemes* is whether Martha had sufficient mind and memory to generally comprehend the nature and extent of her property. Looking to the record and to the evidence submitted to the trial court by the Burks on this element, we determine that Robert and Janet's affidavits, Olszewski's deposition and the affidavit of attorney Jay Wagner are dispositive that Martha was generally aware of the nature and extent of her estate at or near the time she signed her Will.

**{¶25}** Robert's affidavit reveals that between June 14 and June 18, 2014, Martha directed him to place her home in Alabama for sale. (Doc. No. 29 at ¶ 8). His affidavit further avers that Martha had recently loaned Stephen $200,000 and she expected him to repay it. (*Id.* at ¶ 10).

**{¶26}** Janet's affidavit confirms Martha's loan to Stephen, and identifies several of Martha's financial documents to justify the loan. (Doc. No. 30 at ¶¶ 4-6; Doc. No. 30 Ex. B-E). Janet's affidavit also avers that Martha discussed with her (while at Mill Creek) "matters such as her home, the contents of her house, her car, and her financial accounts including her checking and credit card accounts." (*Id.* at ¶ 11).

**{¶27}** Janet's affidavit further details that she was present when Martha met with attorney Jay Wagner (at Mill Creek) and that "Martha was able to name the bank accounts and credit cards she owned * * * was able to describe her 6,000 square foot house * * * [and] was able to describe her Cadillac motor vehicle." (*Id.* at ¶ 19).

**{¶28}** Furthermore, Janet's affidavit avers that between June 14 and June 18, 2014, Martha instructed (Robert and Janet) "to close out her business affairs in Alabama and move her personal property and financial holdings to Ohio." (*Id.* at ¶22).

**{¶29}** Lastly, Janet's affidavit states that Martha "wanted all of her financial accounts to be in her estate and subject to the terms of her Will and that such accounts be liquidated and consolidated into a savings and checking account at the Galion Branch of the US Bank." (*Id.* at ¶ 33).

**{¶30}** Lisa Olszewski's deposition also provides evidence of Martha's knowledge of her property, through their discussions of Martha's Medicare days. (12/22/14 Lisa Olszewski Dep. at 22-29). Our conclusion from Lisa's testimony is that there is no genuine issue of material fact as to whether Martha was keenly aware of the negative impact upon her finances should she run out of her Medicare days by remaining in the hospital too long.

**{¶31}** The affidavit of attorney Jay Wagner also contains evidence of Martha's awareness of the extent of her property. (Doc. No. 27). Wagner's affidavit avers that when he met with Martha at Mill Creek on June 12, 2014, Martha told him that she owned bank accounts at USAA Bank, Compass Bank, and other banks in Alabama. (*Id.* at ¶ 3, 5). Wagner's affidavit further avers that Martha told Wagner she owned real estate in Alabama, personal property in that home, and a Cadillac automobile. (*Id.*). Lastly, Wagner's affidavit confirms Martha's loan to Stephen and her wishes that Stephen's share of her estate be subject to a testamentary trust through her Will. (*Id.* at ¶ 10).

**{¶32}** In our *de novo* review of this second element of testamentary capacity, the evidence is such that reasonable minds could not differ that Martha was able to generally comprehend the nature and extent of her property. Hence, Robert and Janet have sustained their summary judgment burden under *Niemes* on the second element of testamentary capacity.

<u>*Names and Identities of Those who have*</u>
<u>*Natural Claims to Martha's Estate*</u>

**{¶33}** The third element of testamentary capacity under *Niemes* is whether Martha had sufficient mind and memory of the names and identities of those individuals who have natural claims to her estate. Once again, the burden is upon Robert and Janet, as summary judgment movants, to provide the absence of a

genuine issue of material fact on this element.  In our *de novo* review of the evidence on this element, we find that ample evidence was presented to the trial court by Robert and Janet to establish this burden.

**{¶34}** Lisa Olszewski testified that Martha wanted her (Lisa) to call her brother, Robert, and that Martha wanted her (Lisa) to meet him.  (12/22/14 Lisa Olszewski Dep. at 29-31).  Lisa also testified that she was aware of Martha's sister, Mary Jane Fuller, who lived in Ohio.  (*Id.* at 34).

**{¶35}** Wagner's legal secretary, Louise Brutchey ("Brutchey") met with Martha at Mill Creek on June 13, 2014, to gather information for Wagner.  (Doc. No. 26 at ¶ 5).  Brutchey's affidavit reveals that Martha told her that her (Martha's) husband and daughter had predeceased her and that her only living child was her adult son, Stephen.  (*Id.* at ¶ 6).  Brutchey witnessed Martha's Will on July 3 at Mill Creek.  (*Id.* at ¶ 14).  Brutchey's affidavit further avers that Martha identified Robert as her brother and Janet as her sister-in-law to Ralph Mills, the other witness to Martha's Will, at the time Martha signed her Will.  (*Id.* at ¶ 13).

**{¶36}** The affidavit of attorney Jay Wagner states that Martha told him that her late husband, James, died on January 16, 2004 and confirmed that Martha's daughter predeceased her.  (Doc. No. 27 at ¶ 9-10).  Wagner's affidavit also states that Martha wished to name family members Robert and Janet Burk as beneficiaries

of her Will, and to create a testamentary trust in her Will for her son, Stephen. (*Id.* at ¶ 11).

**{¶37}** In our *de novo* review of the third element of testamentary capacity under *Niemes* we determine that there is no genuine issue of material fact as to whether Martha had sufficient mind and memory to hold in her mind the names and identities of those who had natural claims to her bounty at or near the time she executed her Will. Accordingly, Robert and Janet have met their burden as to the third element under *Niemes.*

*Martha's Appreciation of her Relation to Members of her Family*

**{¶38}** The final element as to testamentary capacity under *Niemes* is whether Martha was able to appreciate her relation to the members of her family at or near the time she signed her Will.

**{¶39}** The depositions of Bear, Olszewski, and Campton are replete with references as to Martha's strained relationship with Stephen. (*See generally,* 12/22/14 Lisa Olszewski Dep. at 22, 26; 12/16/14 Stuart Bear Dep. at 20; 12/16/14 Jacqueline Campton Dep. at 30, 52). Bear testified that "Martha was * * * disgusted with her son [Stephen], absolutely disgusted with him." (12/16/14 Stuart Bear Dep. at 20). He further testified that Martha was "looking forward to going back home with family and friends." (*Id.* at 21). Bear also testified that Martha hired him to

change the locks in her home, in February, 2014, because of Stephen's marital and alcohol problems. (*Id.* at 40-41).

**{¶40}** Campton testified that Stephen was Martha's caregiver at the time she was admitted to Jackson Hospital on May 2, 2014. (12/16/14 Jaqueline Campton Dep. at ¶ 8; Ex. 1). She also testified that Stephen called her on June 5, 2014 and left her a voicemail requesting that someone else be appointed to have "power of stuff" over Martha. (*Id.* at 46-47).

**{¶41}** Olszewski testified that Martha wanted to replace Stephen as her power of attorney because she (Martha) "felt like Stephen would blow her money." (12/22/14 Lisa Olszewski Dep. at 44). Olszewski also testified that Martha was unhappy with Stephen because he pressured her into buying him a home in Alabama, which was not a good decision on her (Martha's) part. (*Id.* at 65).

**{¶42}** The affidavits of Brutchey and Wagner also reveal evidence of Martha's relation with family members. Wagner states that Martha told him that Stephen "physically and emotionally abused her," while Brutchey states that Martha moved back to Ohio because Stephen "had mismanaged her care." (Doc. No. 27 at ¶ 4; Doc. No. 26 at ¶ 5). The affidavit of Brutchey also reveals that Martha relied upon Robert and Janet, and that her relationship with them was very good. (*See generally,* Doc. No. 30, ¶ 3).

**{¶43}** Lastly, the affidavit of Mary Jane Fuller, Martha's sister, avers that Martha told her that Stephen hurt her (Martha) and her injury required stitches. (Doc. No. 31 at ¶ 5). Fuller also avers that Martha told her that Stephen had threatened her (Martha) "by putting a gun to her head." (*Id.*).

**{¶44}** Moreover, we find in our *de novo* review that the record demonstrates an absence of a genuine issue of material fact that Martha had sufficient mind and memory to appreciate her relation to members of her family at or near the time she signed her Will and Appellees have met their burden as to the fourth element of testamentary capacity under *Niemes*.

**{¶45}** Accordingly, we find in our *de novo* review that Robert and Janet successfully met their summary judgment burden by demonstrating the absence of a genuine issue of material fact on all of the essential elements of Stephen's claim that Martha lacked testamentary capacity to make a Will at or near the time she executed her Will on July 3, 2014.

### *Civ.R. 56(E) Reciprocal Burden*

**{¶46}** Under Civ.R. 56(E), Stephen, as the non-moving party to summary judgment, has the reciprocal burden of proof as set forth in Civ.R. 56(E) to "set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party." *Dresher, supra,* at 293.

**{¶47}** Our *de novo* review of the record on the issue of testamentary capacity now shifts to the evidence submitted by Stephen to the trial court in opposition to the Burks' motion. Such evidence includes: Martha's medical records; the pleadings; and the affidavits of the Appellant, Jason Beehler, Jenny Koge, Kimberly Collins, Julie Kight, Dr. Gohar Ghazarian, and Sandra Hayes. We will discuss such evidence in turn.

*Affidavit of Stephen Sigler*

**{¶48}** On the issue of Martha's testamentary capacity, Stephen's affidavit asserts that his mother, Martha, had resided in Alabama since 1979 until she moved to Ohio on June 10, 2014. (Doc. 33, Ex. A, ¶ 2). He avers that prior to her moving to Ohio, Martha "suffered from numerous medical conditions, including end stage kidney failure and dementia." (*Id.,* ¶ 3). Stephen also avers that he was Martha's primary caregiver when she lived in Alabama. (*Id.,* ¶ 4). He further avers that on May 1, 2014 Martha fell and injured her pelvis resulting in her being hospitalized at Jackson Hospital in Alabama and that the medical records, from Jackson Hospital, reveal that Martha was suffering from "mental impairment," "confusion," and "decreased responsiveness." (*Id.* at ¶ 5). However, he does not reference the exact dates and specific documents in support of this contention.

**{¶49}** His affidavit also details the acts of Robert and Janet Burk to relocate Martha to Mill Creek nursing home which included moving her personal belongings from Alabama to Ohio. (*Id.,* ¶¶ 5-8).

**{¶50}** However, Stephen's affidavit fails to specifically address the elements of testamentary capacity (under *Niemes*) relative to his mother and further fails to direct us to his personal observations of his mother's physical and mental condition at or near the time she signed her Will. His affidavit is vague as to when he last visited Martha in Alabama, and if he ever visited her after she moved to Ohio. Stephen's affidavit is conclusory and fails to create a genuine issue of material fact as to his mother's testamentary capacity.

### *Affidavit of Jason Beehler*

**{¶51}** Next, we review the affidavit of Jason Beehler ("Beehler"), one of Stephens' attorneys. (Doc. 33, Ex. B, ¶ 3). Beehler's affidavit contains a summary of Martha's medical records and was presented to the trial court for the court's "convenience." (*Id.*, ¶ 4, Ex. B-1). In addition to this summary, Beehler also attached true and accurate copies of Martha's medical records from Mill Creek Nursing Home in Galion, Ohio (Ex. B-2) and records from DaVita Dialysis in Montgomery, Alabama (Ex. B-3). (*Id.,* ¶¶ 5-6).

**{¶52}** Finally, in addition to Martha's medical records, Beehler also attached his first and second requests for discovery (to the Burks); a copy of the audio

recordings of the pre-trial hearing on jurisdiction held in the trial court; a copy of the Burks' video response to Beehler's requests for discovery; and a copy of Robert Burk's deposition. (*Id.,* ¶¶ 7-12). However, Beehler does not direct us to the portions of these documents as to relevant evidence on Martha's testamentary capacity.

{¶53} Hence, the purpose of Jason Beehler's affidavit is to identify medical records and other documents which were presented to the trial court and has limited evidentiary value.

### *Affidavit of Jenny Koge*

{¶54} Jenny Koge's ("Koge") affidavit states that she was the Director of Nursing at Mill Creek during Martha's stay in 2014. (Doc. 33, Ex. C, ¶ 5). Koge states that Martha was "often confused" while at Mill Creek. (*Id.,* ¶ 7).

{¶55} Koge's affidavit details a meeting involving Martha, Martha's family, and presumably, Martha's attorney at Mill Creek. (*Id.,* ¶ 9). Koge states that at this meeting Martha "did not appear fully coherent" and was moaning (in pain) and appeared agitated, which caused frustration to the attorney present. (*Id.*). No date was given as to the meeting, names of the family member(s) present, or identity of the attorney present. (*Id.*).

{¶56} Koge's affidavit also avers that she treated Martha on July 2, 2014, observing Martha to have "increased confusion" from the prior visits with her.

Attached to Koge's affidavit were her progress notes from July 2, in which Koge noted that Martha had ascites, a medical condition that causes pain and confusion. (*Id.* at ¶ 11).

{¶57} Koge's affidavit paint's Martha's condition, especially on July 2, 2014, with a broad brush. Her statement that Martha had "increased confusion" is vague and fails to connect the confusion to any *Niemes* element. Thus, Koge's affidavit does not establish a genuine issue of material fact that remains to be litigated as to the testamentary capacity of Martha.

### *Affidavit of Kimberly Collins*

{¶58} Kimberly Collins' ("Collins") affidavit states that she is a registered nurse and worked as an RN at Mill Creek during Martha's stay there. (Doc. 33, Ex. D, ¶¶ 4-5). Collins' affidavit chronicles her treatment of Martha starting June 23, 2014, noting Martha's conversation was "confused at times." (*Id.*, ¶ 15). The affidavit identifies her nursing progress notes, revealing that Martha screamed out "mama, mama," and that Martha failed to recognize Collins as her nurse on June 23. (*Id.*, ¶ 16).

{¶59} Collins further states that on June 24, Martha told her "that she is going crazy and does not know why." (*Id.*, ¶ 17). Additionally, Collins avers that Martha did not understand where she was and that she did not understand that (her deceased) mother was not present. (*Id.*). However, Collins does reveal that Martha was on a

heavy narcotic on June 24, and that medication was changed due to its impact upon Martha's behavior. (*Id.* at ¶ 16).

**{¶60}** Collins' affidavit also states that she treated Martha on July 1 and July 2, 2014, noting Martha was "lethargic" and "was oriented to herself only." (*Id.*, ¶ 22). Finally, Collins states that on July 5, 2014 Martha was "alert and oriented to herself only." (*Id.*, ¶ 25).

**{¶61}** We determine that Collins' affidavit does not create a genuine issue of material fact as to Martha's testamentary capacity. Moreover, even though Collins' affidavit presents us with valid evidence that Martha was in poor health, it reveals that Martha was often sedated, which impacted Martha's behavior prior to July 3, 2014.

### *Affidavit of Julie Kight*

**{¶62}** Julie Kight's ("Kight") affidavit states that she is a licensed speech pathologist and provided those services to residents of Mill Creek Nursing Home. (Doc. 33, Ex. E, ¶¶ 4-6). Kight's affidavit states that "speech and cognition are closely related and a decline in cognitive function often manifests itself in a decline in speech function." (*Id.*, ¶ 7).

**{¶63}** Kight avers that she worked with Martha when Martha was very ill, stating Martha was "compromised nutritionally and cognitively." (*Id.*, ¶ 11).

Kight's progress notes were attached to her affidavit and marked as Exhibit 1. (*Id.,* ¶ 13).

**{¶64}** Kight averred that she worked with Martha at Mill Creek for twenty-two days, June 11, 2014 through July 2, 2014. (*Id.,* ¶ 14). Kight's evaluation (of Martha on June 11th) indicates that she needed to work with Martha on "her verbal reasoning skills." (*Id.,* ¶ 15).

**{¶65}** Kight's affidavit chronicles her work with Martha, and states that on June 23 Martha had "decreased orientation to her environment," along with "noted nonsensicle [sic] speech." (*Id.,* ¶ 17). Kight stated that Martha, on June 25, had an "increased level of confusion" from her previous visit with Martha (on June 23). (*Id.,* ¶ 19). And on June 26, Kight asserts, in layman's terms, that Martha "did not know where she was." (*Id.,* ¶ 20). Specifically, Kight avers that "Martha didn't know what day it was, the time of day, or the month." (*Id.*).

**{¶66}** Lastly, Kight's affidavit states that July 2 was her last visit with Martha, and "Martha was not oriented to time or environment" and had "noted increased nonsensical speech." (*Id.,* ¶ 21).

**{¶67}** It is apparent that Kight met with Martha frequently during Martha's stay at Mill Creek. Yet, Kight's affidavit fails to specifically address whether Martha was not of sound mind and memory to understand the nature of the business in which she engaged, or was not able to comprehend the nature and extent of her

property, or whether she knew the names and identities of those who had a natural claim to her estate; or whether she understood her relation with her family members. The affidavit's lack of specificity to the testamentary capacity of Martha results in its failure to create a genuine issue of material fact that remains to be litigated on the issue of testamentary capacity.

### *Affidavit of Gohar Ghazarian, M.D.*

**{¶68}** Gohar Ghazarian's ("Dr. Ghazarian") affidavit avers that he is a medical doctor and is board certified in internal medicine. (Doc. 33, Ex. F, ¶¶ 4-6). Dr. Ghazarian states that he was a Hospitalist at Galion Community Hospital in 2014 and treated Martha when she was a patient there on July 10, 2014. (*Id.,* ¶¶ 6-7). When he treated Martha, Dr. Ghazarian avers that she was "chronically ill," had "dementia," and was a poor historian of her medical history. (*Id.,* ¶ 10). Dr. Ghazarian avers that Martha was "not oriented to place or time" on July 10th. (*Id.,* ¶ 11).

**{¶69}** Dr. Ghazarian's affidavit also reveals that Martha was chronically ill on July 10 and under numerous medications, including Xanax (for anti-anxiety) and Norco (for pain), which impacted her orientation at that time. (*Id.* at ¶ 12). But, Dr. Ghazarian's affidavit does not specifically address the elements under *Niemes* regarding Martha's testamentary capacity to make a will. Further, Dr. Ghazarian's treatment of Martha was related to blood in her stool, and not dementia. (*Id.* at ¶ 7).

Thus, Martha may have been suffering from dementia and may have been on medication that affected her behavior, but like the affidavits of Koge, Collins, and Kight, Dr. Ghazarian's affidavit fails to specifically relate her condition to the elements discussed under *Niemes.*

### *Affidavit of Sandra Hayes*

{¶70} The affidavit of Sandra Hayes ("Sandra") asserts that she had known Martha since 2006. (Doc. 33, Ex. G, ¶ 2). The affidavit states that Sandra and Martha were friends and that Sandra visited Martha monthly since 2013. (*Id.*). Sandra was aware that Martha was hospitalized in Alabama, in May, 2014 for a broken pelvis. (*Id., ¶¶* 1, 4). When Sandra first visited Martha at Jackson Hospital, Martha's personality and demeanor were "her usual." (*Id.*). Sandra also states that when she visited Martha later in May, 2014, (after Martha was transferred back to Jackson Hospital from the rehabilitation center in Alabama) she noticed Martha's condition had "deteriorated." (*Id., ¶* 5). She states that at that time Martha was in "a lot of pain but was very confused as to the circumstances." (*Id.*).

{¶71} Sandra avers that she visited Martha twice between June 2 and June 6, 2014 after Martha returned to Jackson Hospital, (from the rehabilitation center) averring that Martha's memory "would come and go during the visits." (*Id., ¶* 6). The affidavit states that Sandra's last visit with Martha occurred on June 9 at Jackson Hospital, describing Martha's condition as "horrible." (*Id., ¶* 7). Sandra

avers that Martha failed to recognize her and Martha repeatedly asked "where she was." (*Id.*).

**{¶72}** Sandra avers that she spoke with Martha two to three times after she (Martha's) moved to Ohio, finding Martha to be "very weak and often incoherent." (*Id.*, ¶ 12).

**{¶73}** We determine that Hayes' affidavit does not specifically address the elements of testamentary capacity under *Niemes*, and therefore does not create a genuine issue of material fact as to Martha's testamentary capacity to make her Will.

### *Exhibit B-1*

**{¶74}** In addition to the above affidavits, Appellant submitted Martha's medical records from Jackson Hospital, from Davita Dialysis, from Mill Creek Nursing Home, and from Galion Community Hospital to the trial court. Since Stephen received his power of attorney from Martha on May 25, 2014, such is our starting point of these records as to testamentary capacity.

**{¶75}** Exhibit B-1, Summary of Martha Sigler's Medical Records, was presented to the trial court to direct it to Martha's medical records regarding her physical and mental condition at or near the time she made her Will. We note that the majority of the references in Exhibit B-1 concern Mill Creek Nursing Home records. Since we previously addressed Martha's medical records from Jackson Hospital and Galion Community Hospital when we analyzed the affidavit of

Stephen, and the deposition of Campton, and affidavit of Dr. Ghazarian, we need only address the medical records from Mill Creek Nursing Home now.

**{¶76}** As noted above, evidence of Martha's mental and physical condition, both at the time the Will was signed and within a reasonable time before and after its execution, is admissible as casting light on her testamentary capacity. *See generally, Kennedy v. Walcutt,* 118 Ohio St. 442, 161 N.E. 336, paragraph two of the syllabus, *overruled on other grounds, Krischbaum v. Dillon,* 58 Ohio St.3d 58, 567 N.E.2d 1291 (1991). Exhibit B-1's discusses Martha's medical records prior to signing her will (June 23-July 2, 2014) and after its execution (July 5 – July 9, 2014). Exhibit B-1 reveals just one record on July 3, the day she signed her Will, which we will discuss first.

**{¶77}** Exhibit B-1 directs us to Martha's medical record of July 3, the nursing notes from Mill Creek Nursing Home, which state that "[p]atient keeping eyes closed when communicating with patient in AM." However, the exhibit does not expand further as to how a person talking with their eyes closed creates a genuine issue of material fact. This conduct (talking with eyes closed) is innocuous and does not create a genuine issue of material fact, under *Niemes,* regarding Martha's testamentary capacity on July 3, 2014.

**{¶78}** Regarding the medical records regarding Martha's condition prior to executing her Will, we now look to those records from Mill Creek, dated June 23 to

July 2, 2014. Exhibit B-1 contains 24 referenced events between those dates: eleven (11) references are identified as "nursing notes;" seven (7) identified as "speech therapy notes;" three (3) identified as "physical therapy notes;" two (2) identified as "occupational therapy notes;" and one (1) identified as from "dialysis."

{¶79} As to the eleven references of "nursing notes," we find that such encompasses just six (6) days of Martha's stay at Mill Creek: June 23, 24, 29, 30, and July 1, 2, 2014. Since we have already discussed these eleven references in our analysis of the affidavits of Collins and Koge, no further discussion is required. Likewise, we analyzed the seven (7) references identified as "speech therapy notes" (June 23-27, July 1 and 2) during our discussion of Kight's affidavit above.

{¶80} The remaining six references identified as "physical therapy notes" (3 references), "occupational therapy notes" (2 references) and "dialysis" (1 reference) chronicle Martha's physical and mental condition on June 23, 24, 25, 26, and July 1. Specifically, these notes refer to Martha being "unable to stay awake" on June 23; being "agitated" on June 24; having "increased shaking in hands and feet" and "yelling and screaming" on June 25; having "increased confusion" on June 26; and "patient falling asleep" on July 1. These references were not developed by Stephen and fail to provide specificity as to how these conditions influenced Martha's testamentary capacity. The mere fact that Martha's hands were shaking or that she

-29-

was in pain or was confused, standing alone, does not create a genuine issue of material fact.

{¶81} As to the references in Exhibit B-1 regarding Martha's physical and mental condition after she signed her Will, the seven (7) references in the exhibit encompass July 5-9, 2014. Four (4) of the references are identified as "nursing notes" and the other three (3) are identified as "occupational therapy notes" and "physical therapy notes." These seven (7) references, like the 24 references discussed above, are vague and conclusory, and fail to create a genuine issue of material fact as to Martha's testamentary capacity.

{¶82} Thus, in our review of Exhibit B-1, Summary of Martha Sigler's Medical Records, we determine that this exhibit does not create a genuine issue of material fact that remains to be litigated herein.

*Other Evidence*

{¶83} In addition to her medical records, Stephen also attached a list of his mother's possessions removed by Robert and Janet from Martha's home in Alabama (Doc. No. 33, Ex. A-C); a copy of the listing of Martha's Alabama home (*Id.*, Ex. A-E); and Stephen's correspondences to the Burks concerning Martha's home and personal property in Ohio (*Id.,* A-F). Further, a copy of Martha's Last Will and Testament, executed on July 3, 2014 and the Durable Power of Attorney executed on June 13, 2014 were also attached to the affidavits as exhibits. (Doc. No. 33, Ex.

A-H). A copy of Martha's 2012 Income Tax Return, as well as copies of Martha's Alabama property tax documents and Alabama voter registration documentation were as attached as exhibits. (*Id.,* Ex. A-I, J, K). And an amended Certificate of Death for Martha is also contained in the record. (*Id.,* Ex. A-H). Lastly, the record contains the deposition of Robert Burk, as well as Robert and Janet's withdrawal records for Martha's Pentagon Federal Credit Union account.

**{¶84}** Appellant fails to direct us as to how these records create a genuine issue of material fact regarding Martha's physical or mental condition at the time she signed her Will or within a reasonable period of time prior to or after she signed her Will. As such, our review of these exhibits as to the testamentary capacity of Martha is not necessary.

**{¶85}** Accordingly, considering the evidence presented by the Appellant in opposition to summary judgment as to the testamentary capacity of Martha, we find that Robert and Janet sustained their burden as to the absence of a genuine issue as to any material fact that must be litigated and that reasonable minds can come to but one conclusion and that conclusion is Martha had the testamentary capacity to make a Will on July 3, 2014. Thus, the trial court did not err in granting summary judgment on the issue of testamentary capacity. Accordingly, Stephen's assignment of error as to the issue of testamentary capacity is overruled.

*Summary Judgment as to Undue Influence*

**{¶86}** The second portion of Sigler's appeal centers on the trial court's grant of summary judgment on his claim of undue influence. To prevail on a claim of undue influence a "plaintiff must prove four elements: (1) the individual in question was susceptible to undue influence; (2) another person had the opportunity to exert undue influence over the susceptible individual; (3) improper influence was exerted or attempted; and (4) the result shows the effect of such influence." *Huntington v. Riversource,* 2015-Ohio-5600, 45 N.E.3d 1053, ¶ 40 (7th Dist.), *appeal not allowed sub nom. Huntington Natl. Bank v. Riversource Life Ins. Co.,* 145 Ohio St.3d 1471, 2016-Ohio-3028, 49 N.E. 3d 1313, ¶ 40.

**{¶87}** However, "'[w]here a fiduciary or confidential relationship exists between the donor and the donee, the transfer is regarded with suspicion that the donee may have brought undue influence to bear upon the donor.'" *Id.* at ¶ 41, quoting *Smith v. Shafter,* 89 Ohio App.3d 181, 183, 623 N.E.2d 1261 (3rd Dist. 1993) citing *Willis v. Baker,* 75 Ohio St. 291, 79 N.E. 466, (1906). "A presumption arises in which the donee bears the burden of going forward with proof of the validity of the gift, however, the party attacking the gift ultimately retains the burden of proving undue influence by clear and convincing evidence." *Smith, supra.*

**{¶88}** "'A fiduciary relationship is one in which special confidence and trust is placed in the integrity and fidelity of another, who acquires a resulting position

of superiority or influence by virtue of this special trust.'" *Fox v. Stockmaster,* 3rd Dist. Seneca Nos. 13-01-34, 13-01-35, 2002-Ohio-2824, ¶ 52 quoting *In re Estate of Case,* 2nd Dist. Montgomery No. 16747, 1998 WL 151141, * 3 (Apr. 3, 1998) citing *Stone v. Davis,* 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981). Furthermore, "[t]he holder of a power of attorney has a fiduciary relationship with the principal. This fiduciary relationship imposes a duty of loyalty to the principal." *Temple v. Temple,* 2015-Ohio-2311, 38 N.E.3d 342, ¶ 29 (3rd Dist.).

**{¶89}** In this case Robert and Janet were Martha's attorneys-in-fact as of June 13, 2014. (*See generally,* Doc. No. 33, Ex. A-H). Thus, a fiduciary relationship existed between Martha and the Burks prior to her decision to make her new Will. Further, and as Martha's POAs, Robert and Janet used such authority prior to Martha's death. (*See generally*, Jan. Burk Dep. 30:4-8; 35:6-16; Doc. No. 33, Ex. A, ¶ 10). Regardless of the reasons for Robert and Janet's use of the powers of attorney, a presumption of undue influence results under the facts presented. As such, a genuine issue of material fact exists to determine whether Robert and Janet's fiduciary relationship with Martha was free of undue influence and that Martha voluntarily acted with full knowledge of the consequences of her actions to make her Will by a preponderance of the evidence.

**{¶90}** Thus, we find that the trial court erred by not affording Stephen the opportunity to litigate this presumption by its grant of summary judgment on the issue of undue influence.

**{¶91}** Therefore, Stephen's assignment of error as to the order of the trial court granting summary judgment on the claim of undue influence is well taken and is sustained.

**{¶92}** Accordingly, having found error prejudicial to the appellant, in the particulars assigned and argued, we affirm the trial court's order granting summary judgment on the issue of testamentary capacity, and we reverse the judgment of the trial court as to the order of summary judgment on the undue influence cause of action. This matter is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**