BLAND et al., Appellants,

v.

GRAVES et al., Appellees.

[Cite as *Bland v. Graves* (1994), 99 Ohio App.3d 123.]

Court of Appeals of Ohio,
Summit County.

Nos. 16637, 16721.

Decided Nov. 23, 1994.

124

*A. Joseph Waterman,* for appellants.

*Richard Gurbst* and *Thomas G. Kovach;* *Howard L. Calhoun,* for appellee James R. Graves.

*Joel Aberth* and *Stephen G. Thomas,* for other appellees.

EDWARD J. MAHONEY, Judge.

Plaintiffs-appellants, Sheila Dow, Ann Cluett, and Hazel Bristol, appeal from the probate court's order directing a verdict in favor of the defendants-appellees in this will contest action. We affirm.

This is the second time this case is before this court on appeal. See *Bland v. Graves* (1993), 85 Ohio App.3d 644, 620 N.E.2d 920. Accordingly, a brief synopsis of the prior proceedings is necessary before we can review the issues raised in this appeal.

On November 18, 1989, Irene Willis, age eighty-two, died testate, leaving an estate valued at approximately $2.8 million. Irene had executed a will on August 2, 1988, in which she devised the bulk of her estate to seven residual beneficiaries, each taking an equal share. The seven beneficiaries are long-time friends of Irene, but only one is related to her. On October 12, 1989, Irene executed a

codicil to her will in which she added two more residual beneficiaries, neither of whom is related to Irene.

At the time of her death, Irene did not have any children, siblings, or other surviving relatives descended from her grandparents. Instead, Irene's closest surviving relatives at her death were nine second cousins (in the sixth degree of relationship), descendants of her great-grandparents.[1] The second cousins amassed as plaintiffs in two separate will contest actions, which were consolidated for trial. The second cousins claimed that Irene lacked testamentary capacity or, in the alternative, that the will and codicil were the product of undue influence. If Irene's will and codicil were to be declared invalid, all nine of the second cousins would be entitled to equal shares of the $2.8 million estate under Ohio's statute of descent and distribution. R.C. 2105.06. Otherwise, the estate would be distributed to the defendants-appellees, the beneficiaries named in Irene's will and codicil.

After trial, the jury concluded that the will and codicil were not the product of undue influence; however, the jury did find that Irene lacked testamentary capacity, thereby invalidating the will and codicil. Following the submission of briefs on the issue of a new trial, Summit County Probate Court Judge Willard Spicer granted a new trial on the issue of testamentary capacity, concluding that the jury misunderstood the law, resulting in a verdict that was "contrary to law and against the manifest weight of the evidence." See Civ.R. 59(D). Judge Spicer then recused himself from presiding over the retrial because, after hearing the evidence from the first trial, he had come to "a firm conclusion on the validity of the will and codicil." On April 7, 1993, this court affirmed Judge Spicer's grant of a new trial, finding no abuse of discretion. *Bland,* 85 Ohio App.3d at 650–657, 620 N.E.2d at 923–928.

The issues raised in the present appeal involve the proceedings leading up to the second trial. Upon Judge Spicer's recusal, Ohio Supreme Court Chief Justice Thomas J. Moyer assigned Trumbull County Probate Judge Thomas Swift to preside over the second trial. On October 14, 1993, Judge Swift held an evidentiary hearing on the issue of settlement negotiations. Attorneys representing two separate groups of plaintiffs were present at this hearing. Attorney Joel Aberth represented a group of plaintiffs entitled to four intestate shares (the Aberth plaintiffs). Attorneys Joseph Waterman and Stephen Thomas represented a group of plaintiffs entitled to another four intestate shares (the Waterman plaintiffs). Apparently, based on an agreement not contained in the record, Attorney Waterman retained Attorney Thomas as trial counsel for the Waterman

---

1. Two of the second cousins died after Irene. These second cousins are now represented in this litigation by the executors of their respective estates.

plaintiffs. It appears that Attorney Thomas was also given authority to engage in settlement negotiations.

At the hearing, the Aberth plaintiffs indicated a desire to settle. Attorney Thomas represented to the court that two of the Waterman plaintiffs, Jeanne Bland and Eileen Smyth, were also inclined to settle. It appears the remaining Waterman plaintiffs, appellants herein, were less inclined to settle.[2] The hearing transcript indicates that substantial discord existed between Attorneys Thomas and Waterman, with both attorneys representing to the court that Attorney Thomas' status as trial counsel was in doubt. After hearing all the parties, Judge Swift set the trial date for January 10, 1994, the next opportunity the probate courtroom would be available on the busy trial docket.

Following the hearing, Judge Swift issued an order on December 13, 1993, authorizing the parties to proceed with settlement negotiations. On December 15, Attorney Thomas moved to withdraw as one of the appellants' attorneys so that he could pursue a settlement as counsel of record for the other Waterman plaintiffs, Jeanne Bland and Eileen Smyth. Attorney Waterman did not respond to this motion. On December 22, Judge Swift granted Attorney Thomas' motion to withdraw. On December 28, Judge Swift issued an order approving settlements with Jeanne Bland and Eileen Smyth and all of the Aberth plaintiffs.

On December 30, 1993, the appellants moved for a continuance of the January 10, 1994 trial date, claiming that Attorney Thomas was responsible for all the trial preparation and that in light of his withdrawal, the appellants needed additional time to secure new trial counsel. Judge Swift denied the continuance on January 3, holding that "the record clearly reflects that Attorneys Waterman and Gibson intended to proceed without Stephen G. Thomas as trial counsel."

The trial proceeded as scheduled on January 10, 1994. The appellants renewed their motion for a continuance and made a flurry of additional motions claiming that they were being denied a fair trial and due process of law. Judge Swift denied all the motions. The case proceeded to voir dire, and a jury was empaneled. However, after voir dire, Attorney Waterman indicated to the court that he was not going to present evidence on behalf of the appellants, stating that "we will not subject ourselves to an unfair trial." On January 11, Attorney Waterman did not appear in court to present the appellants' case. The defendants-appellees presented their evidence and were granted a directed verdict. The appellants filed a timely notice of appeal from the directed verdict, and the case was assigned Summit App. No. 16637.

---

2. The appellants, Hazel Bristol, individually, and Sheila Dow and Ann Cluett, as co-executors, claimed two intestate shares as Waterman plaintiffs. Jeanne Bland and Eileen Smyth, individually, claimed the other two intestate shares as Waterman plaintiffs.

The appellants next moved the probate court for a declaration that the settling plaintiffs' assignments of interests in the litigation, executed as part of the settlement agreements, were void. The appellants' motion was denied on March 8, 1994. The appellants filed a timely notice of appeal from that order, and the case was assigned Summit App. No. 16721. This court consolidated the two appeals, and the cases are now before us for disposition on the merits. The appellants raise four assignments of error.

In their first assignment of error, the appellants contend that the probate court abused its discretion and denied them due process of law when it overruled their motions for a continuance of trial. A ruling on a motion for a continuance is a matter entrusted to the sound discretion of the trial court. *Heard v. Sharp* (1988), 50 Ohio App.3d 34, 35, 552 N.E.2d 665, 666. As such, the trial court's ruling will be reversed on appeal only if the court abused its discretion, which entails a finding that the court acted unreasonably, arbitrarily, or unconscionably. *Niam Investigations, Inc. v. Gilbert* (1989), 64 Ohio App.3d 125, 127, 580 N.E.2d 840, 841.

As an aid in determining whether a trial court has abused its discretion in ruling on a motion for a continuance, the Ohio Supreme Court has set forth a test that balances the trial court's interest in controlling its own docket, which includes the obligation to facilitate the prompt and efficient dispatch of justice, against any potential prejudice to the moving party. *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080. Under the *Unger* test, the objective factors that may be considered by the trial court in assessing the propriety of a motion for continuance include "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the [moving party] contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *Id.* at 67–68, 21 O.O.3d at 43, 423 N.E.2d at 1080.

The first prong of the appellants' argument is that it was an abuse of discretion for the probate court to deny a continuance after the court permitted Attorney Thomas, the appellants' trial counsel, to withdraw just nineteen days before trial, leaving the appellants unprepared to litigate. In *Hartt v. Munobe* (1993), 67 Ohio St.3d 3, 9, 615 N.E.2d 617, 622, the Ohio Supreme Court determined that "a judge's denial of a continuance because of counsel's unpreparedness is not an abuse of discretion if the unpreparedness was avoidable." See, also, *Touche Ross & Co. v. Landskroner* (1984), 20 Ohio App.3d 354, 355, 20

OBR 459, 459–460, 486 N.E.2d 850, 852. After reviewing the entire record of this litigation, we find that the appellants' unpreparedness was avoidable.

Attorney Waterman essentially claims that the appellants were not aware that Attorney Thomas would not be acting as trial counsel until December 27, the day Waterman received notice of Thomas' withdrawal from the probate court. A review of the transcript from the October 14 evidentiary hearing, however, clearly indicates Attorney Waterman doubted at least three months before trial that Attorney Thomas would be acting as trial counsel. The following dialogue is indicative of the doubt expressed by Attorney Waterman throughout the hearing:

"THE COURT: As I understand * * * your problem is that you will not be able to go to trial on this Bland will contest we've scheduled for January 10th * * * because now you're telling me Mr. Thomas is not going to be trial counsel for that.

"MR. WATERMAN: He may or may not be depending upon what happens that we've been trying to work out over a period of months, but it's quite possible he may not be * * *."

Part of what Attorney Waterman had been "trying to work out" was the acquisition of copies of trial preparation materials from Attorney Thomas. On this issue, the court stated to Attorney Waterman, "You can make whatever arrangements have to be made to substitute Mr. Thomas. We can have hearings to determine what papers Mr. Thomas is holding hostage." By the end of the hearing, Attorney Thomas agreed to deliver all of his trial preparation materials to a copying company within seven days, and Attorney Waterman agreed to pay the copying expenses.

In their first motion for a continuance, the appellants argued that part of their unpreparedness for trial was due to Attorney Thomas' refusal to turn over any case documents. In response to this representation, Attorney Thomas filed a brief to clarify the record, stating that he had arranged for copying of the case documents and that "the copies [had] been available for delivery to Mr. Waterman since late October 1993, but * * * Mr. Waterman refuses to pay the costs incurred for that purpose."

From this record, we find that the appellants' unpreparedness for trial could have been avoided. Attorney Waterman clearly represented to the court nearly three months before trial that it was unlikely Attorney Thomas would be acting as trial counsel. In fact, it appears Attorney Waterman was preparing for this contingency by seeking court assistance to facilitate acquisition of Attorney Thomas' trial preparation materials. It further appears that any delay in acquiring those materials was attributable solely to Attorney Waterman's own lack of diligence and not to any conduct by Attorney Thomas. Thus, considering

all the facts and circumstances that were before the probate court when the continuances were requested, we cannot say that the probate court abused its discretion in denying those requests.

■ The second prong of the appellants' argument invokes DR 6–101(A) of the Code of Professional Responsibility. The appellants contend that the probate court abused its discretion in denying a continuance because Attorney Waterman was forced to choose between either knowingly providing his clients with incompetent or inadequate representation, a violation of DR 6–101(A), or completely forgoing representation of his clients at trial, of which Attorney Waterman chose the latter. We find this argument to be meritless.

DR 6–101(A) provides that a lawyer shall not:

"(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

"(2) Handle a legal matter without preparation adequate in the circumstances."

At least one Ohio appellate court has found that a trial court may, under limited circumstances, commit error if the denial of a continuance would force an attorney to violate DR 6–101(A). See *In re Sherlock* (1987), 37 Ohio App.3d 204, 211, 525 N.E.2d 512, 519–520. However, that same appellate court has also held that this type of error will not be found if the attorney "[was] not adequately prepared due solely to [his] own inaction." *State v. Christon* (1990), 68 Ohio App.3d 471, 477, 589 N.E.2d 53, 57. This result follows from DR 6–101(A)(3), which states that "[a] lawyer shall not neglect a legal matter entrusted to him," and EC 6–4, which provides that "[h]aving undertaken representation, a lawyer should use proper care to safeguard the interest of his client * * * [and] his obligation to his client requires him to prepare adequately for and give appropriate attention to his legal work." See *Christon, supra*.

As discussed previously, Attorney Waterman's unpreparedness to go to trial, the result of having failed to timely secure new trial counsel, was due to his own lack of diligence. Thus, any ethical dilemma raised by that unpreparedness cannot be attributed to the probate court's actions; rather, Attorney Waterman's alleged ethical dilemma was solely the result of Attorney Waterman's not being adequately prepared due to his own inaction. As stated by the court in *Christon*, "[w]e are not inclined to allow attorneys to place themselves in positions that are questionable under the Code of Professional Responsibility and then claim that this very position immunizes them from [the consequences of their conduct]." 68 Ohio App.3d at 477, 589 N.E.2d at 57. See, also, *State v. Gasen* (1976), 48 Ohio App.2d 191, 195–196, 2 O.O.3d 156, 158, 356 N.E.2d 505, 508, fn. Accordingly, because Attorney Waterman's own inaction placed him in a questionable position

under the Code of Professional Responsibility, the probate court was free to exercise its discretion and deny the appellants' repeated requests for a continuance.

The appellants' first assignment of error is overruled.

■ The appellants' second and third assignments of error involve Section 5(C), Article IV of the Ohio Constitution and R.C. 2701.03, Ohio's constitutional and statutory provisions concerning the disqualification of a common pleas court judge on the basis of personal interest, bias, or prejudice. Section 5(C), Article IV of the Ohio Constitution provides:

"The chief justice of the supreme court or any judge of that court designated by him shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof. Rules may be adopted to provide for the hearing of disqualification matters involving judges of courts established by law."

R.C. 2701.03 was promulgated under the authority of Section 5(C), Article IV and sets forth the procedural requirements for filing an affidavit of disqualification with the Chief Justice.

On January 6, 1994, the appellants filed an affidavit with the Clerk of the Supreme Court to disqualify Judge Swift on the grounds of bias and prejudice. Chief Justice Moyer denied that affidavit of disqualification on January 7, 1994. On the same day that the first affidavit was denied, the appellants filed a second affidavit of disqualification with the Clerk of the Supreme Court. That affidavit was denied by the Chief Justice on January 14, 1994. In their second assignment of error, the appellants argue that the trial court lacked jurisdiction to proceed with the January 10 trial because the second affidavit to disqualify Judge Swift was still pending with the Chief Justice.

■ Generally, if an affidavit to disqualify has been properly filed, a trial judge is without authority to proceed with substantive aspects of the case until the Chief Justice has passed upon the issue of disqualification. *State ex rel. Lomaz v. Court of Common Pleas of Portage Cty.* (1988), 36 Ohio St.3d 209, 210, 522 N.E.2d 551, 553, fn. 2; *Cuyahoga Cty. Bd. of Mental Retardation v. Assn. of Cuyahoga Cty. Teachers of the Trainable Retarded* (1975), 47 Ohio App.2d 28, 35–37, 1 O.O.3d 168, 172–174, 351 N.E.2d 777, 783–785. However, the Cuyahoga County Court of Appeals has recognized an exception to the general rule in cases where the litigant files a second affidavit to disqualify and there has been no substantial change in the status of the case since the time the first affidavit was denied. *Cleveland v. White Properties, Inc.* (1985), 28 Ohio App.3d 37, 38–39, 28 OBR 47, 48–49, 501 N.E.2d 1231, 1232–1233. Thus, under *White Properties,* if a second affidavit to disqualify is filed against the same judge, in the same case,

reciting substantially the same facts as the first affidavit, and there is nothing to indicate that the second affidavit will warrant a different result, then the judge may proceed to trial before receiving the Chief Justice's ruling on the second affidavit. *Id.* The *White Properties* decision has been cited approvingly by Chief Justice Moyer, *In re Disqualification of Sweeney* (1987), 36 Ohio St.3d 602, 522 N.E.2d 456, and by this court, *In re Disqualification of Kimbler* (1988), 44 Ohio App.3d 9, 10, 540 N.E.2d 756, 757–758. Considering the facts in this present appeal, we find that the *White Properties* decision is controlling.

The appellants' second affidavit of disqualification was filed on January 7, within hours of the denial of the first affidavit. The second affidavit was filed against the same judge, in the same case, and recited facts almost identical to those contained in the first affidavit. After thoroughly reviewing the record, we have found nothing to indicate that the status of the case had substantially changed in those few intervening hours or that any facts had arisen that would have warranted a result different from the disposition of the first affidavit. Therefore, based on *White Properties,* the probate court had jurisdiction to proceed to trial despite the fact that the second affidavit of disqualification was still pending.

The appellants' second assignment of error is overruled.

In their third assignment of error, the appellants claim that Section 5(C), Article IV and R.C. 2701.03 are repugnant to Constitution of the United States. Specifically, the appellants take objection to the Ohio Supreme Court's interpretation of those provisions in *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 441–442, 8 O.O.3d 438, 439–440, 377 N.E.2d 775, 776–777, in which the court held that a court of appeals is without authority to pass upon the issue of disqualification or void a judgment of a trial court on that basis, since only the Chief Justice may hear disqualification matters under R.C. 2701.03. The appellants argue that by giving the Chief Justice sole discretion in passing upon the disqualification of judges without any meaningful guidelines or standards, and by not allowing for review of the Chief Justice's decision, Section 5(C), Article IV and R.C. 2701.03 deny litigants the fundamental right to due process of law guaranteed by the Fourteenth Amendment.

The United States Supreme Court has decided several cases in which the court has addressed the requirements of the Due Process Clause in the context of judicial disqualification. In *Tumey v. Ohio* (1927), 273 U.S. 510, 522–523, 47 S.Ct. 437, 441, 71 L.Ed. 749, 754, the court determined that not all questions of judicial disqualification invoke constitutional considerations. Instead, "matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion," which do not implicate the Fourteenth Amendment. *Id.* This view was reiterated in *Fed. Trade Comm. v.*

*Cement Inst.* (1948), 333 U.S. 683, 702–703, 68 S.Ct. 793, 804, 92 L.Ed. 1010, 1035, in which the court stated that "most matters relating to judicial disqualification [do] not rise to a constitutional level." More recently, in *Aetna Life Ins. Co. v. Lavoie* (1986), 475 U.S. 813, 828, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823, 837, the court concluded that "the Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today." [3]

■ Relying on the *Tumey* and *Cement Institute* decisions, the *Lavoie* court found that the Due Process Clause generally does not mandate procedural requirements for the disqualification of judges. On the contrary, " 'it is normally within the power of the State to regulate procedures under which its laws are carried out * * * and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.' " 475 U.S. at 821, 106 S.Ct. at 1585, 89 L.Ed.2d at 832, quoting *Patterson v. New York* (1977), 432 U.S. 197, 200–201, 97 S.Ct. 2319, 2322–2323, 53 L.Ed.2d 281, 286–287.

The appellants argue in their brief that Ohio's disqualification procedure, R.C. 2701.03, denies them "the right to adequately challenge the participation of a biased or prejudiced judge." The appellants base their argument in large part on the fact that the Chief Justice has sole discretion to decide questions of disqualification and that this decision is not subject to review. Yet, the appellants fail to cite any authority that would indicate that Ohio's procedure offends "some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental." *Lavoie,* 475 U.S. at 821, 106 S.Ct. at 1585, 89 L.Ed.2d at 832. Instead, the appellants cite apparently more expansive or rigorous disqualification procedures in other jurisdictions as an example of the inadequacy of Ohio's disqualification procedure and its failure to provide due process of law.

The fact that other jurisdictions arguably may have more expansive or rigorous disqualification procedures, however, is not relevant to a determination of whether Ohio's disqualification procedure is adequate under the Due Process Clause.

---

**3.** In *Lavoie,* the court reaffirmed the long-standing rule that no judge " 'can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome.' " 475 U.S. at 829, 106 S.Ct. at 1589, 89 L.Ed.2d at 833, quoting *In re Murchison* (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946. On the facts, the *Lavoie* court held that the Due Process Clause required that an Alabama Supreme Court justice be disqualified to hear a case because he had a direct, personal, substantial, and pecuniary interest in the outcome. In this case, however, the appellants did not challenge the probate court judge on grounds that he had a direct, personal, substantial, and pecuniary interest in the outcome. Instead, the appellants' challenge was limited to allegations of bias and prejudice.

Rather, our inquiry is limited to whether Ohio's procedure is consistent with the United States Supreme Court's decisions in this area of the law. After reviewing those decisions, we find that the appellants' argument is without merit.

In discussing the minimum due process requirements for judicial disqualifications, the *Lavoie* court began its analysis with the traditional common-law rule that disqualifications for bias or prejudice were not permitted. 475 U.S. at 820, 106 S.Ct. at 1584, 89 L.Ed.2d at 832. Thus, a fundamental right to disqualify a judge for bias or prejudice is not rooted in common-law tradition. On the contrary, this right has been recognized only more recently as the modern trend has been towards adopting statutes that permit disqualification for bias or prejudice. *Id.* As enunciated by the *Lavoie* court, that modern trend "alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause." *Id.*

Based on *Lavoie*, we find that the Due Process Clause does not require a state to provide a pretrial procedure for disqualifying a judge on the grounds of bias or prejudice. Instead, the decision whether to provide such a pretrial procedure is a matter of state legislative discretion. *Tumey*, 273 U.S. at 522–523, 47 S.Ct. at 441, 71 L.Ed. at 754. Ohio has exercised that discretion in R.C. 2701.03, which permits a litigant to file an affidavit of disqualification prior to trial and have it reviewed by a disinterested, high-ranking judicial officer. We find that this procedure adequately permits a litigant to challenge the participation of an allegedly biased or prejudiced judge prior to trial and thus more than comports with the requirements of the Due Process Clause as outlined in *Lavoie*. See, also, *Pocker v. Brown* (C.A.6, 1987), 819 F.2d 148 (finding that Section 6[C], Article IV of the Ohio Constitution, which permits the Chief Justice to assign retired judges to hear cases, does not violate the Fourteenth Amendment).

The appellants' third assignment of error is overruled.

In their fourth and final assignment of error, the appellants contend that the settlement agreements are void as against public policy, collusive, and the result of improper *ex parte* hearings conducted in violation of Canon 3(A)(4) of the Code of Judicial Conduct. We find these contentions also to be without merit.

In its December 13, 1993 order authorizing settlement negotiations, the probate court provided:

"If at any time prior to the jury being called in this matter, any of the parties reach written agreement as to settlement * * *, the settling party or parties shall present to this Court a written settlement agreement for approval and may present the written agreement on an *ex parte* basis. At the request of any settling party, the Court shall conduct an examination of the written settlement

agreement *in camera.* If a written settlement agreement approved by this court requires or permits payment of funds from the estate of Irene Willis, said payment may be authorized prior to the date set for trial in this matter, so long as the funds remaining in the estate of Irene Willis after payment of the settlement amounts permit all remaining non-settling contesting plaintiffs to be able to receive the dollar amount that said non-settling plaintiff[s] would have received in accordance with applicable law had no settlement been reached by a settling party, the aforementioned dollar amount to be estimated upon the known and reasonably anticipated liabilities of the Estate for claims, expenses of administration and taxes."

 It is well settled that the law favors the prevention of litigation through compromise and settlement. *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 17, 615 N.E.2d 1022, 1029–1030. To this end, a trial judge is given considerable discretion to promote settlement among the parties. *Ohio Med. Professional Liability Underwriting Assn. v. Physicians Ins. Co. of Ohio* (1985), 27 Ohio App.3d 23, 24, 27 OBR 24, 25–26, 499 N.E.2d 347, 348. Thus, it is not an abuse of discretion for a trial judge to suggest a procedure or provide a process which facilitates settlement of all or part of the litigation. *Id.* As stated by the Supreme Court, "[s]o long as there is no evidence of collusion, in bad faith, to the detriment of other, non-settling parties, the settlement of litigation will be encouraged and upheld." *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 69–70, 567 N.E.2d 1291, 1302.

We find the Supreme Court's decision in *Krischbaum* to be particularly illuminating in respect to the appellants' attack on the validity of the settlement agreements. In *Krischbaum,* the plaintiffs, heirs at law, brought a will contest action alleging lack of testamentary capacity and undue influence. The defendants to this will contest action were the two named beneficiaries in the decedent's will. Prior to trial, one of the defendants, Riker, settled with the will contestants. On appeal, the other defendant, Dillon, contended that it was contrary to public policy to permit the will contestants to settle the action with one beneficiary to the detriment of the remaining beneficiary. The Supreme Court rejected Dillon's argument, finding that "[a]lthough, as a result of settling with the contestants, Riker abandoned his position in the litigation, he had no obligation to maintain his position notwithstanding that he had reached a satisfactory settlement with the contestants." *Id.* at 69, 567 N.E.2d at 1302. Thus, the court concluded that in the absence of evidence that the settlement agreement was the product of collusion, made in bad faith, or otherwise detrimental to a non-settling party, the settlement was valid and enforceable.

 In this case, even though the appellants are challenging the validity of the settlement agreements as will contestants, not beneficiaries, we find that the

same result as in *Krischbaum* follows. First, the appellants have offered only broad, general, and conclusory allegations of collusion and bad faith while absolutely failing to point to any specific evidence in the record that would substantiate their allegations or support invalidating the settlement agreements. Second, since the appellants failed to present evidence or call any witnesses at trial, there is simply no record to support their allegations that the settlement agreements "robbed" them of a fair, adversarial trial or turned their formerly allied witnesses, the settling plaintiffs, into "enemies" hostile to their cause. Finally, in light of the rule of law favoring compromise and settlement, we find the appellants' reliance on Canon 3(A)(4) to be wholly misplaced.

Canon 3(A)(4) of the Ohio Code of Judicial Conduct provides:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate not consider *ex parte* or other communications concerning a pending or impending proceeding. * * * Nothing contained herein, however, shall preclude a judge from non-substantive *ex parte* communications on procedural matters and matters affecting prompt disposal of the business of the court."

Upon reviewing Canon 3(A)(4), we find that the appellants' only possible argument is that the probate court's *ex parte* and *in camera* review of the settlement agreements denied them a full right to be heard. Such an argument, however, is meritless.

The main impetus for the October 14 evidentiary hearing was to evaluate the possibility of settlement, and the appellants were present, had an opportunity to be heard and, in fact, indicated that they might consider a settlement offer. Clearly, the October 14 hearing was not *ex parte*, and the probate court did nothing after the hearing to restrict the appellants from fully and equally participating in any settlement negotiations with the defendants-appellees. The only *ex parte* and *in camera* action authorized by the probate court involved the court's requirement that it review and have final approval of any settlement proposals agreed to by the parties. We find that this *ex parte* and *in camera* review was a reasonable method whereby the court could protect the confidentiality of those parties who wanted to settle while still preserving the non-settling plaintiffs' ability to recover if the will and codicil ultimately were invalidated at trial. Given that the three plaintiffs' attorneys expressed varying degrees of interest in settling during the October 14 hearing, we cannot say that the probate court abused its discretion in providing this settlement procedure. Thus, considering the nature of the litigation in light of the considerable discretion that must be afforded a judge in facilitating compromise and settlement, we find that the

probate court's *ex parte* and *in camera* action did not violate Canon 3(A)(4) or amount to an abuse of discretion.

In sum, the record does not contain any evidence that the settlement agreements were the product of collusion, made in bad faith, or otherwise detrimental to the appellants, the non-settling parties in this litigation. Absent this evidence, the settlement agreements must be upheld. The appellants' fourth assignment of error is overruled.

The judgment of the probate court is affirmed.

*Judgment affirmed.*

QUILLIN, P.J., and DICKINSON, J., concur.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.