[Cite as *Stanek v. Stanek*, 2019-Ohio-2841.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| DANIEL G. STANEK, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 2018-CA-39 |
| | : | |
| v. | : | Trial Court Case No. 11533C |
| | : | |
| EDMUND D. STANEK, et al. | : | (Civil Appeal from |
| | : | Probate Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of July, 2019.

. . . . . . . . . .

JUD R. MAUGER, Atty. Reg. No. 0063375 and GREGORY P. BARWELL, Atty. Reg. No. 0070545, 100 E. Broad Street, Suite 2350, Columbus, Ohio 43215
    Attorneys for Plaintiffs-Appellants

PETER R. CERTO, JR., Atty. Reg. No. 0018880, One South Main Street, Suite 1590, Dayton, Ohio 45402
    Attorney for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** This appeal arises from a dispute among siblings about their father's estate. Appellants, Daniel Stanek, Arlene Bottenfield, and Rosemarie Keenan appeal from a judgment upholding the will and a transfer on death beneficiary designation made by Edmund E. Stanek, and finding that Appellee, Edmund D. Stanek, did not exercise undue influence over his father.[1]

**{¶ 2}** In challenging the judgment, Appellants have raised five assignments of error. Essentially, they contend that the trial court abused its discretion and that the judgment was against the manifest weight of the evidence.

**{¶ 3}** For the reasons discussed below, we conclude that the trial court did not err in rejecting Appellants' attempt to challenge the validity of the will and transfer on death beneficiary designation due to lack of testamentary capacity and undue influence. The court's judgment was not against the manifest weight of the evidence. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 4}** As a preliminary matter, we note that our recitation of facts relies primarily on the testimony of Appellants, because the trial court stated that:

> All the witnesses at trial were credible, except Defendant [Ed]. They projected a calm, respectful, and confident demeanor. They were responsive to questions. * * *

---

[1] To avoid confusion, we will refer to the decedent as "Stanek" and to his son as "Ed." When we refer to the other parties collectively, we will use "Appellants."

Defendant lacked any credibility whatsoever. His testimony was deceptive and was peppered with snide and argumentative comments. He was arrogant, flippant and evasive. Even when others were testifying, Defendant's body language was purposely distractive, rolling his eyes and shooting looks of disbelief when others were testifying. His previous blatant lie to this Court in an earlier hearing – stating that the Merrill Lynch accounts had been nearly depleted – tainted everything he said during trial. Words cannot describe the horrible impression Defendant made on the Court.

Doc. #82, Decision and Judgment Entry, p. 6.

{¶ 5} The decedent, Edmund E. Stanek, was born in 1924 and died on February 1, 2017, at age 92. He and his wife had four children: Daniel, Arlene, Rosemarie, and Ed. In 1986, Stanek executed a will naming his wife, Maria, as his sole beneficiary. In the event that Maria predeceased him, each child was to be given an equal share of the assets. If one of the children also predeceased Stanek, his or her share lapsed and was to be distributed equally to the remaining children. Maria was named executrix, and in the event of her death, Ed was named as executor. If Ed could not serve, Daniel was to be the executor.

{¶ 6} In 1996, Stanek sent Daniel, Arlene, and Rosemarie a letter listing an enormous amount of money that he and his wife had spent on Ed. The list was titled "Expenditures for Ed's Domestic Violence w/Firearm + Divorce Cases," and disclosed more than $43,000 in expenses that had been paid. Plaintiff's Ex. 2, pp. 2-4. The letter further stated that "[i]f neither Mom or I receive reimbursement, this sum should be

deducted from Ed's share of our estate. It would not be fair otherwise." *Id.* at p. 1.

{¶ 7} In March 2000, Stanek executed a First Codicil to his will. At that time, Maria had been recently diagnosed with Alzheimer's, but was still capable. Due to the progressive nature of her disease, however, the family had been advised to change paperwork for the will. The codicil designated Daniel as executor; if he were unable to serve, Arlene and Rosemarie were to serve as co-executrixes. Daniel made up packets containing the last will and testament and codicil, along with a power of attorney, and everyone received a packet. In November 2000, Stanek also sent Daniel and Arlene a detailed list of all of his and Maria's property, including their residences, income property, checking and savings account numbers, insurance policy numbers, life insurance information, IRA information, and the like.

{¶ 8} At the time of Maria's diagnosis, Stanek and Maria lived in Cleveland and also owned a condo in Florida. Ed had lived with them in Cleveland for significant periods of time, including after his 1976 divorce; during the late 1980's; and during and after his second divorce, from around 1996 to 2001. In the 2000-2001 time-frame, Arlene had discussions with her parents about moving to Dayton, Ohio, where she lived. This was due to Maria's Alzheimer's diagnosis and the desire to keep Maria at home. As a result, Stanek and Maria came to Dayton in 2001 to look at properties. They then built a condo and moved into it in April 2002.

{¶ 9} Ed lived with Maria and Stanek in their Cleveland house until it was sold. When Maria and Stanek moved to Dayton from Cleveland, they told Daniel to tell Ed that he was not expected and was not welcome to move with them to Dayton. Subsequently, Ed moved in with Arlene and lived with her for several months.

{¶ 10} After the move and until 2005, Maria and Stanek were living on their own with some assistance from Arlene, who typically went over every day, first to make sure Maria got up, and then in the evening, to make meals. After Stanek had surgery in 2005, Ed and his girlfriend/fiancée moved in with his parents. During that time, Stanek paid the girlfriend about $1,500 per week to compensate for her lost income. While these payments were anticipated to be made only for a short time, they lasted longer due to Stanek's illness. Ed did not specifically say at trial how long this lasted, but his comments in medical records indicate that his fiancée left after a couple of years, which would have been sometime in 2007. *See* Plaintiff's Ex. 1.

{¶ 11} In September 2007, Ed was arrested and removed from his parents' home after assaulting his father. Shortly after the incident, Ed returned to get his belongings. Arlene and her husband were there, and her parents were outside the house. At that time, Ed said to Arlene and her husband: "you think this -- this is all about money; and if you think you're going to get away with me being gone, I'll make sure that you don't see a penny of dad's money ever." Transcript of Bench Trial, ("Tr. 1"), p. 182. During the six to eight months that Ed was gone, the family had home care, and Arlene was also there daily to care for her mother. At that time, the care was for Maria; Stanek did not really need care.

{¶ 12} In 2008, Ed returned to his parents' home. According to Arlene, Ed was living in a breezeway of another home and asked his father if he could move back in. Ed claimed, in contrast, that his father "begged" him to come back. In any event, Ed returned and remained in the home until February 2017, when his father died. Maria had previously died on June 4, 2012.

**{¶ 13}** From 2005 until his death, Stanek had a number of hospitalizations and medical problems, including bladder and prostate cancer; a triple bypass; diabetes; essential hypertension; anemia; a cholecystectomy in July 2010 with a complicated post-operative course, including respiratory failure and cardiac arrest; delirium in September 2010 due to conditions classified elsewhere; chronic kidney disease; MRSA in a sternal incision; loss of peripheral vision due to stroke; retinopathy; a cataract; mild cognitive impairment; and a hearing impairment. Stanek was also overweight and had significant mobility issues. In February 2012, the medical notes indicate that Stanek was not capable of managing his medications and that he was "[i]ncapable of handling money." Plaintiff's Ex. 1 at p. 2. These issues remained the same throughout the rest of Stanek's life.[2]

**{¶ 14}** In 2014 alone, Stanek had several hospitalizations. On April 30, 2014, he had a gastrointestinal bleed and lost six pints of blood. During the hospitalization, he had three cardiac arrests, was sent to Kindred Care from May 16 to June 4, 2014, and was then sent to Dayton Rehab, where he remained until around the last week of June 2014. *See* Defendant's Ex. D.

**{¶ 15}** On June 4, 2015, Stanek signed several documents that had been prepared by Attorney Pete Rife. These included: (1) a last will and testament, which made Ed the sole beneficiary of Stanek's estate and effectively disinherited the other siblings; (2) a living will (naming Ed as first in priority to be notified if an attending physician determined

---

[2] The medical records that were submitted ended on June 30, 2016, several months before Stanek died. *See* Defendant's Ex. G. There is no indication that his health got better; in fact, Arlene stated that Stanek's worst time was the several months before he passed away in February 2017.

that life-sustaining treatment should be withheld; Arlene was listed second); (3) a power of attorney granting Ed the power to act on Stanek's behalf concerning all his affairs; and (4) a durable power of attorney for health care granting Ed the power to act in all health care decisions, and rejecting the designation of an alternate beneficiary. *See* Plaintiff's Exs. 3, 5, 6, and 7. In addition, Stanek brought a Merrill Lynch power of attorney form to Rife's office. This form had already been filled in. Stanek signed this power of attorney as well, giving Ed the power to withdraw and transfer any amount of money from Stanek's account to himself or to third parties. *See* Plaintiff's Ex. 4. Notably, the new will and other documents were signed on the anniversary of Maria's death, which was a significant day for Stanek.

{¶ 16} Rife had virtually no recollection of the transaction. His paralegal, who prepared the documents, indicated that they were prepared and signed very quickly, within a day or so after the office was contacted. No copies of any documents were sent to Appellants, nor did Ed ever notify them of any changes in the will. Rife was not the attorney for the prior will and codicil.

{¶ 17} Both Daniel and Arlene were aware that their father had a significant amount of money in a Merrill Lynch account. Daniel became aware of this in 2007 when Ed was not living in the house and Daniel was assisting his father with financial matters. The account had a transfer-on-death ("TOD") designation, so that it would transfer to Maria if Stanek predeceased her. If Maria died before Stanek, the account would be included in the estate and would be divided equally among the children.

{¶ 18} On July 8, 2016, Stanek signed a new TOD beneficiary designation, naming Ed as the sole beneficiary on his Merrill Lynch account. Ed believed that his father had

previously signed a form on June 5, 2015 changing the TOD beneficiary from Maria to Ed. However, that was an incorrect form. After Ed and Stanek made several trips to Merrill Lynch, the correct form to change the TOD designation was ultimately signed on July 8, 2016. According to Ed, the Merrill Lynch account was valued in June 2015 at $180,000 to $189,000. At the time of Stanek's death in 2017, the account was valued at $198,000.

{¶ 19} Previously, in 2014, when Stanek was in a nursing home, Daniel, Rosemarie, and Ed went to dinner after visiting their father. Daniel and Rosemarie were concerned about bills and were also concerned because Ed had gone to great lengths to keep their father in the nursing facility after he had been discharged. As a result, a bill of about $17,000 was owed. They asked Ed specifically what had happened to the Merrill Lynch account; Ed said it had been "wiped out" in the 2008 stock market crash, and very little was left in the account.

{¶ 20} Arlene had also seen the Merrill Lynch portfolio when it contained around $240,000. However, between October and November 2016, Ed told her there was very little money in the account. This representation occurred in front of Stanek. Stanek worried about money, and, at some point earlier, had also stopped paying for gifts for his children and grandchildren.

{¶ 21} Between 2013 and 2017, Ed restricted Appellants' personal and telephone contacts with their father. Taking the telephone contacts first, Stanek's hearing impairment inhibited conversation even when contact was allowed. At trial, Stanek's medical records were admitted. These records began in July 26, 2011 (although they included information about prior medical history). Even at that time, the doctor indicated

that Stanek had "limited use" of the phone because of his hearing impairment. Defendant's Ex. A., p. 1. The hearing situation did not improve, and later entries indicated that Stanek was deaf or had serious difficulty hearing, that his hearing was "markedly impaired," that he did not or could not dial the phone, and that he did not hear well. Defendant's Exs. B, C, D, E, F, and G; Deposition of Dr. Lawhorne, pp. 26-34.

{¶ 22} All the Appellants testified that communicating with their father by telephone was very challenging due to his hearing issues. Furthermore, even before 2015, Ed had told his siblings that they should not even bother to talk to their father on the phone. Although Arlene had provided a phone for her father, Stanek did not hear it ring and would not answer it. As a result, in the 2015 time period, Arlene called Ed's phone to speak to her father, because that was the only one her father would use. However, the discussions were frustrating because Stanek could not hear.

{¶ 23} As to visits, Daniel testified that when he visited his father from 2013 to 2017, Ed did not leave him alone with Stanek. While Ed walked out of the room at times, Daniel had to shout so his father could hear. Daniel knew Ed was monitoring the conversations because when he said something, Ed would suddenly pop in from the other room and start talking about that subject. Arlene also said that she was not able to visit alone with her father; Ed was always there and was in earshot. When they asked if they could go out alone with their father, Ed would get upset.

{¶ 24} Although Rosemarie lived in another state most of her adult life, she lived in Ohio from the middle of 2013 to the beginning of 2015. She was living with Daniel part-time, in Columbus, Ohio, and tried to see her father every week; if he were ill, she came every day. According to Rosemarie, there were many times that she was not

allowed to see her father. Every time she called, Ed said that Stanek was sleeping, and also said he would call back, but he did not. When Rosemarie was permitted to visit, she was not allowed to see her father alone.

{¶ 25} When asked whether Ed exerted undue influence, Daniel stated:

Yes. You know, he [Stanek] was * * * a very fragile man toward the end of his life. He had an enormous amount of dependency. As we indicated, * * * he had already been struck in 2007, 2008. He * * * had had a certain amount of, intimidation and feelings of – Well, I think anybody would. I know we all felt intimidated by Eddie at times. And then you add to it that he was basically completely dependent on Eddie for all his appointments, his food, his medicines. There were a lot of opportunities to, you know, not care for him if Eddie so chose. And I think that – I think that my father also – and I'm not going to deny it. Eddie took very good medical care of my father, and I think he appreciated that. And it got to the point where he really felt like, you know, * * * I'm going to completely wait for Eddie's approval on whether I get up, whether I sit down, whether I eat.

* * *

* * * [T]he notion that I had was that [Stanek] was quite dependent on him, on Eddie, for virtually every move, whether or not he would go visit family, whether or not he would show up at social events, whether or not he was able to go to dinner. These were all decisions that essentially Eddie made and did it on my dad's behalf. * * * [I]t got to be particularly acute as time went on and to the point where when I would converse with him[,] he

would actually look past me and look to Eddie as if looking for approval and would speak in almost a robotic form, almost like he was being coached.

Tr. 1 at p. 141-142.

{¶ 26} As noted, the last will and other documents were signed on June 4, 2015, and the final TOD designation was signed on July 8, 2016. Daniel's first impression that something may have changed was after Stanek died, when the funeral director asked who the executor was. Based on his knowledge of the 1986 will and 2000 codicil, Daniel was about to identify himself, but Ed jumped in immediately and said he was the executor. Because he felt it was an inappropriate time to debate the matter, Daniel waited and called Ed on February 15, 2017.

{¶ 27} The first question Ed asked was whether their conversation was being taped. Daniel thought this was odd, and said no, that he was just calling from work. Daniel shared with Ed that they were all very surprised when Ed had said he was the executor. Then, Daniel asked what was going on, whether there was another will. Ed said yes, and attempted to change the subject. During the conversation, Ed also said, "I asked dad for certain things and he gave them to me." *Id.* at p.117. When Daniel asked where the will was, Ed said, "in due time." *Id.* at p. 118. Appellants then did not see the will until after Daniel filed the 1986 will and 2000 codicil on March 3, 2017.

{¶ 28} In the meantime, on February 17, 2017, Ed arranged to have the money in Stanek's Merrill Lynch account transferred to his new account. *See* Plaintiff's Ex. 10. Ed did not inform anyone of these facts or about the fact that the Merrill Lynch account had assets; to the contrary, he actively concealed this from everyone and lied to the court about the assets.

**{¶ 29}** After Daniel filed the will and codicil, Ed filed an application with the court on March 31, 2017, seeking to probate the June 4, 2015 will. Subsequently, in May 2017, Appellants filed the present action to contest the will, to obtain an accounting, and for a temporary restraining order. The trial court construed the complaint as one for a preliminary injunction and set a hearing for June 20, 2017. During the hearing, the trial court discussed filing an entry (to which the attorneys had agreed), so that Ed could pay ordinary and necessary bills of the estate, while preserving the assets until the merits of the case could be decided. *See* Plaintiff's Ex. 9 (Transcript of Preliminary Injunction Hearing), pp. 3-9.

**{¶ 30}** During the hearing, the following exchange occurred:

The Court: Have you liquidated anything yet? Sold anything yet?

Mr. Edmund Stanek: My problem is assets, my dad was not a millionaire.

The Court: I understand that.

Mr. Edmund Stanek: He had a very small pension and Social Security, that's the total assets he lived on for all of his life since he retired.

We are not talking about massive amounts of money.

Ex. 9 at pp. 9-10.

**{¶ 31}** As noted, the trial court later characterized this as a "blatant lie." Doc. #82 at p. 6. After conducting discovery, Appellants sought and were granted leave to file an amended complaint, based on their discovery of the June 4, 2015 Merrill Lynch power of attorney, the change in the TOD beneficiary, and the fact that Ed had misled the court. The amended complaint eliminated the request for a restraining order and added a count

seeking to invalidate the TOD beneficiary designation on the Merrill Lynch account.

**{¶ 32}** In August 2018, the court held a two-day bench trial. The court then issued a judgment in September 2018, concluding that Stanek did not lack testamentary capacity and that Ed did not exercise undue influence. Appellants timely appealed from the court's decision.

## II. Testamentary Capacity

**{¶ 33}** Appellants have presented two assignments of error specifically related to the court's findings on testamentary capacity, two assignments of error related to undue influence, and a combined assignment of error addressing both issues. We will consider the errors pertaining to testamentary capacity together. These assignments of error are as follows:

> The Trial Court Abused Its Discretion in Not Finding that the Decedent Lacked Testamentary Capacity to Change His Will and Transfer on Death Designation of His Merrill Lynch Account.

> The Trial Court's Conclusions Regarding the Testamentary Capacity of Decedent to Change His Will and Transfer on Death Designations Were Unsupported by the Evidence and Are Clearly Erroneous and Contrary to the Weight of the Evidence.

> There was No Evidence Presented at Trial to Support Appellee's Assertions Regarding Testator's Testamentary Capacity * * *.

**{¶ 34}** Under these assignments of error, Appellants contend that the trial court erred by focusing on Stanek's mental competence rather than on the fact that Stanek was

unaware of the extent of his property, which Ed intentionally concealed from him.

{¶ 35} Under R.C. 2107.71(A), persons "interested in a will or codicil admitted to probate * * * that has not been declared valid by judgment of a court * * * may contest its validity by filing a complaint in the probate court in the county in which the will or codicil was admitted to probate." "On the trial of any will contest under section 2107.71 of the Revised Code, the order of probate is prima-facie evidence of the attestation, execution, and validity of the will or codicil." R.C. 2107.74. " 'Prima facie evidence' is not conclusive. The term denotes evidence which will support, but not require, a verdict in favor of the party offering the evidence." *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64, 567 N.E.2d 1291 (1991). "Once the presumption of validity and testamentary capacity arises, the burden of proof shifts to the contestant, who must prove undue influence or lack of testamentary capacity by a preponderance of the evidence." *Bustinduy v. Bustinduy*, 2d Dist. Champaign No. 98-CA-21, 1998 WL 879121, *2 (Dec. 18, 1998), citing *Golding v. Ohio Natl. Bank of Columbus*, 115 Ohio App. 465, 466, 185 N.E.2d 577, (10th Dist.1962). (Other citation omitted.) "The evidence must outweigh the presumption of probate as well as all evidence in favor of the will." *Id.*

{¶ 36} "A testator has capacity to make a will when he has sufficient mind and memory (1) to understand the nature of the business in which he is engaged, (2) to comprehend generally the nature and extent of his property, (3) to hold in his mind the names and identities of those who had natural claims upon his bounty, and (4) to be able to appreciate his relation to members of his family." *In re Estate of Worstell*, 2d Dist. Montgomery No. 19133, 2002-Ohio-5385, ¶ 17, citing *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917).

{¶ 37} "Whether a testator was competent to make a will is not subject to direct proof; competence must be proved inferentially from other evidence." *Worstell* at ¶ 62. "Evidence of the testator's mental and physical condition, both at the time the will is executed and within a reasonable time before and after its execution, is admissible as casting light on testamentary capacity." *Sigler v. Burk*, 3d Dist. Crawford No. 3-16-19, 2017-Ohio-5486, ¶ 7, citing *Kennedy v. Walcutt*, 118 Ohio St. 442, 161 N.E. 336 (1928), paragraph two of the syllabus, *overruled on other grounds, Krischbaum*, 58 Ohio St.3d 58, 567 N.E.2d 1291. *Accord Worstell* at ¶ 46 ("it is the mental condition of the testator at the time of making a will that determines his testamentary capacity").

{¶ 38} Furthermore, while changing a beneficiary designation is a contractual act, courts have held that "the test of testamentary capacity can also be used as a standard for mental capacity to execute a beneficiary designation." *In re Estate of Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, ¶ 84 (6th Dist.), citing *Schiavoni v. Roy*, 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, ¶ 17, and *Rogers v. Frayer*, 11th Dist. Geauga No. 94-G-1854, 1995 WL 408196, *4 (June 16, 1995).

{¶ 39} The trial court concluded that Appellants failed to prove that Stanek was incompetent or lacked testamentary capacity when he signed the will and the Merrill Lynch forms. In this regard, the trial court found that Dr. Lawhorne's testimony failed to support the proposition that Stanek was incompetent; instead, the testimony substantiated that Stanek had infirmities that were not debilitating and were only what one would associate with a 90-year old person. The court also found that Stanek's loss of hearing and vision did "not equate to lack of testamentary capacity." Doc. #82 at p. 7. Finally, the court did not find relevance in whether Stanek read every word of the legal

documents, noting that this is not a condition of testamentary capacity.

{¶ 40} In challenging the court's judgment, Appellants allege abuse of discretion and that the judgment was against the manifest weight of the evidence. Typically abuse of discretion in will contest cases involves matters like continuances, evidentiary rulings, and the like. *See Bland v. Graves,* 99 Ohio App.3d 123, 129, 650 N.E.2d 117 (9th Dist.1994); *Waldecker v. Pfefferle*, 6th Dist. Erie No. E-02-002, 2002-Ohio-6187, ¶ 35 (admission of evidence); *Flowers* at ¶ 75-76 (admission of opinion testimony).

{¶ 41} In contrast, a manifest weight challenge involves "whether the greater amount of credible evidence" supported the judgment. *Flowers* at ¶ 94, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-19, and *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Since Appellants challenge the evidentiary basis for the trial court's decision, we will apply this standard.

{¶ 42} "[I]n civil cases, '[w]hen a [judgment] is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 46 (2d Dist.), quoting *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, which, in turn, quotes *Thompkins* at 387.

{¶ 43} After reviewing the record, we cannot find that the court's judgment with respect to testamentary capacity was against the manifest weight of the evidence. Dr. Lawhorne, who treated Stanek during the relevant times, testified that he did not have

any concerns with Stanek's mental competency. Ex. 1 (Dr. Lawhorne Deposition), pp. 18-19. Furthermore, Stanek's hearing instrument specialist, Jeff Lough, had dealt with Stanek for seven to eight years prior to July 8, 2016. Lough last saw Stanek on this date (which coincidentally occurred the same day the final TOD was signed and was also Stanek's last visit to Lough). Lough testified that during this last appointment, he and Stanek conversed about various things, and that Stanek was able to give appropriate answers to questions that he asked.

{¶ 44} Appellants' own testimony indicated that Stanek was still able to recognize them and other family members during the last two or three years of his life. Daniel, who lived out of town, visited at least once a month; Arlene, who lived in the Dayton area, visited at least once a week during the last few years of her father's life; and Rosemarie visited weekly in 2014 and 2015 when she lived in the area. If her father were ill, she visited daily. From this testimony, it is apparent that Stanek was able to appreciate his family members and to know those who had a natural claim to his bounty. *Worstell*, 2d Dist. Montgomery No. 19133, 2002-Ohio-5385, at ¶ 17.

{¶ 45} Moreover, while the lawyer who prepared the June 2015 will had little recollection of his meeting with Stanek, he said he would not have let Stanek execute the will if he had questions about competency. The secretary who witnessed the signing of this will also testified that she would not have signed if she questioned Stanek's competency. Likewise, the witness to the July 8, 2016 TOD stated that while Stanek had difficulty hearing, she was able to communicate with him by speaking loudly. She also said she did not see anyone coerce him or make him sign the TOD.

{¶ 46} Although Appellants contend that Stanek's unawareness of the content of

his Merrill Lynch accounts was evidence of his incompetence, we disagree. Stanek may have been misled by Ed's lies about the money in the Merrill Lynch account, but this does not mean he was incompetent to make the will or to sign a TOD. Appellants were misled as well, and there is no question that they were competent. In addition, Stanek was aware that he owned a condo in Florida, as he discussed it with Rosemarie in November 2015.

{¶ 47} Based on the preceding discussion, the trial court's finding of testamentary capacity was not against the manifest weight of the evidence. Accordingly, the First Assignment of Error, the Second Assignment of Error, and the part of the Fifth Assignment of Error dealing with testamentary capacity are overruled.

### III. Undue Influence

{¶ 48} The Third, Fourth, and Fifth Assignments of Error, which deal with undue influence, state, respectively, that:

The Trial Court Abused Its Discretion in Not Finding that Decedent Was Unduly Influenced by Appellee Edmund D. Stanek With Regard to the Changing of His Will and Transfer on Death Designations.

The Trial Court's Conclusions Regarding the Lack of Actual Undue Influence by Appellee on Decedent to Change His Will and Transfer on Death Designation Was [sic] Unsupported by the Evidence and Are Clearly Erroneous and Contrary to the Weight of the Evidence.

There was No Evidence Presented at Trial to Support * * * the Trial Court's Conclusion that Appellee Edmund Stanek Did Not Impose Improper

Influence on Testator to Change His Will and Transfer on Death Designation.

**{¶ 49}** Under these assignments of error, Appellants contend that the trial court erred in concluding that they failed to prove undue influence. According to Appellants, the trial court's decision was improperly based on speculative inferences like the "possibility" that the decedent had a "change or heart" when he disinherited three of his adult children and changed his TOD beneficiary. The issue of undue influence presents a far more difficult question than the question of testamentary capacity.

**{¶ 50}** " 'Undue influence' is '[a]ny improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely. * * * ' " *Marich v. Knox Cty. Dept. of Human Services/Children Services Unit*, 45 Ohio St.3d 163, 166, 543 N.E.2d 776 (1989), quoting *Black's Law Dictionary* 1370 (5th Ed.1979). Undue influence "has also been described as a form of influence that would destroy the free agency of the mind and cause people to act against their will." *Ross v. Barker*, 101 Ohio App.3d 611, 618, 656 N.E.2d 363 (2d Dist.1995), citing *Raymond v. Hearon*, 30 Ohio App. 184, 164 N.E. 644 (1st Dist.). (Other citation omitted.)

**{¶ 51}** "The essential elements of undue influence are a susceptible testator, another's opportunity to exert it, the fact of improper influence exerted or attempted, and the result showing the effect of such influence." *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962). " 'The mere existence of undue influence or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient to invalidate a will; such influence must actually be exerted on the mind of the testator with

respect to the execution of the will and, in order to invalidate the will, it must be shown that the undue influence resulted in the making of testamentary dispositions which the testator would not otherwise have made.' " *Kidwell v. Pitts*, 2d Dist. Montgomery No. 22370, 2008-Ohio-4395, ¶ 10, quoting *Buckingham v. Middlestetter*, 2d Dist. Montgomery No. 13575, 1993 WL 81827, *6 (Mar. 22, 1993).

**{¶ 52}** In its judgment, the trial court found that Appellants established three of the elements of undue influence, but found insufficient evidence that Ed "actually imposed improper influence" on Stanek. Doc. #82 at pp. 8-9. In this regard, the court stated that:

> * * * The circumstantial evidence creates suspicion and inferences of potential improper conduct by Defendant [Ed]. However, the Court finds those inferences to be speculative and not supported by substantial probative evidence that those inferences are the most probable or reasonable explanation of what occurred.
>
> The totality of the evidence creates other inferences that are equally plausible. It is entirely possible that Decedent's change of heart resulted from his gratitude that Defendant devoted nine years attending to the personal care of his parents when they needed it most – care which undisputedly was extensive and of good quality. Plaintiff's circumstantial evidence is simply insufficient to overcome other equally reasonable inferences from all the evidence.
>
> Unfortunately, as in most will contest actions, we will never know the true reason Decedent made the changes to his will in 2015. Despite Defendant's complete lack of credibility, it is not his burden to prove

anything.   The burden falls squarely on Plaintiffs.   It is the Court's opinion that Plaintiffs failed to sustain that burden.

Doc. #82 at p. 9.

{¶ 53} Again, while Appellants raise abuse of discretion and a manifest weight challenge, their argument is based on the evidence (and alleged lack of it). Consequently, we will apply the manifest weight standard.   As noted, a manifest weight challenge involves "whether the greater amount of credible evidence" supported the judgment." *Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, at ¶ 94.   Given the trial court's credibility findings, one must look for credible evidence to support the judgment in places other than Ed's testimony.

{¶ 54} This case is very troubling in view of the deceit that Ed showed to his family and the court.   In addition, difficulty is caused by the fact that evidence of improper influence is rarely direct; most evidence is circumstantial.   *Buckingham*, 2d Dist. Montgomery No. 13575, 1993 WL 81827, at *8 (Fain, J., concurring in judgment). However, "[c]ircumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence." *In re Estate of Marsh*, 2d Dist. Greene No. 2010 CA 78, 2011-Ohio-5554, ¶ 53, citing *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).   Whether "circumstantial evidence is conjectural and the inference speculative is essentially 'the distinction between a reasonable inference and a guess.' " *Id.*, quoting *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, 768 N.E.2d 619, ¶ 156.

{¶ 55} In explaining its comment about inferences, the Supreme Court of Ohio referenced two cases that a defendant (PTZ) had cited for the proposition that "where

different inferences are equally deductible from the same proved facts, neither inference may be indulged." *Mid-America Tire* at ¶ 155, discussing *Dunkle v. Std. Life & Acc. Ins. Co.*, 114 Ohio App. 65, 69, 180 N.E.2d 198 (4th Dist.1961), and *Zeigler Milling Co. v. Denman,* 79 Ohio App. 250, 252, 72 N.E.2d 686 (5th Dist.1946).

**{¶ 56}** In *Mid-America Tire*, PTZ argued that another party (who made false promises to the plaintiffs about a transaction) was not its agent since there was no direct evidence that PTZ made the party its agent. *Id.* Because the plaintiffs had allegedly tried to meet their burden by pointing to " ' inferences drawn from neutral facts,' " PTZ argued, based on *Dunkle* and *Denman* that "where different inferences are equally deductible from the same proved facts, neither inference may be indulged." *Id.*

**{¶ 57}** The Supreme Court of Ohio disagreed, stating that:

PTZ has succeeded in showing only that the evidence going to [the alleged agent's] status in the underlying transaction is circumstantial and would have been sufficient to support differing conclusions. But not all circumstantial evidence is conjectural, and not every inference is speculative. The difference lies essentially in the distinction between a reasonable inference and a guess. *Dunkle* and *Denman* do not, nor could they, proscribe the drawing of reasonable inferences from proved facts. Instead, they preclude the trier of fact from engaging in speculation, that is, theorizing about a matter upon which the evidence is insufficient to support a conclusion either way.

*Mid-America Tire*, 95 Ohio St.3d 367, 2002-Ohio-2427, 768 N.E.2d 619, at ¶ 156.

**{¶ 58}** Here, the "proved facts" were that Ed had lived with and had been financially

supported by his parents for much of his adult life. Their relationship was difficult, contradictory, and volatile at times, with his parents bailing Ed out of legal troubles by expending large sums of money, but also ejecting him from their home on two different occasions – one of which involved Ed's assault of his father. Yet, when Stanek added the 2000 codicil that excluded Ed as an executor, he chose not to decrease Ed's share of the inheritance. Ed's parents also let him back in their home after the 2007 assault, and he lived there until his father's death in 2017.

{¶ 59} Other examples of the contradictory nature of the relationship are reflected in the medical records. The February 21, 2012 medical notes indicated that the doctor listened to a "taped conversation" between Ed and his father "when they discussed in a heated argument their difficult relationship." Plaintiff's Ex. 1 at p. 1. Previously, however, a July 26, 2011 medical note indicated that Stanek had described Ed as a "terrific help." Defendant's Ex. A at p. 1. Other medical notes indicated that Ed and Stanek "were getting along well," and that Ed provided "24/7 care for [Stanek] and continues to do an excellent job." Defendant's Exs. B, p. 1 (July 24, 2012), and G, p. 1 (June 30, 2016).

{¶ 60} Likewise, Daniel testified that "I think that my father also – And I'm not going to deny it. Eddie took very good medical care of my father, and I think that he appreciated that." Tr. 1 at p. 141. This is not to say that the other three children did not care for their father – they did so to the extent of their ability, given their proximity. Nonetheless, Ed was the primary caretaker of both his parents between 2008 and 2017, and apparently took very good medical care of them.

{¶ 61} Unfortunately, in light of these facts, we cannot say the trial court's

comments were speculative and should be disregarded. While we may have made a different decision, the trial court's observations were based on a reasonable inference from the evidence. Ed and Stanek appeared to have had a co-dependent relationship that Stanek did not have with his other children. Stanek may have reasonably decided that Ed was incapable of supporting himself and that he should continue financially supporting Ed after death, as he had done in life.

{¶ 62} Accordingly, while the result is troubling, we have no option but to affirm the trial court's judgment. As the court observed, Ed did not have the burden of proof. *See Hamilton v. Hector*, 117 Ohio App.3d 816, 820, 691 N.E.2d 745 (3d Dist.1997) (party claiming undue influence has the burden of establishing the elements).

{¶ 63} Accordingly, the Third and Fourth Assignments of Error, and the part of the Fifth Assignment of Error relating to undue influence, are overruled.

## IV. Conclusion

{¶ 64} All of Appellant's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Jud R. Mauger
Gregory P. Barwell
Peter R. Certo, Jr.
Hon. Thomas M. O'Diam